# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Civil Action No. 11-cv-570

| | | |
|---|---|---|
| RASHARD MENDENHALL, | ) | JURY DEMANDED |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HANESBRANDS, INC., | ) | |
| a Maryland corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT OF RASHARD MENDENHALL FOR DAMAGES AND OTHER RELIEF

RASHARD MENDENHALL ("Mr. Mendenhall" or the "Plaintiff"), by and through his counsel indicated below, for his Complaint against HANESBRANDS, INC. ("Hanesbrands" or the "Defendant") states and alleges as follows:

## INTRODUCTION AND NATURE OF THE CASE

1.     Rashard Mendenhall is a professional athlete now entering his fourth season in the National Football League ("NFL") where he has been employed as a running back by the Pittsburgh Steelers. In his young football career, Mr. Mendenhall has enjoyed remarkable success. According to the Steelers website, Mr. Mendenhall "[e]xploded onto the scene in 2009 with one of the best single-season rushing performances in Steelers' history," rushing 242 times for 1108

yards and seven touchdowns. During the 2010 season, Mr. Mendenhall rushed 324 times for 1273 yards and scored the second most rushing touchdowns of any player. During the 2010 NFL playoffs, Mendenhall led all players in rushing touchdowns and was second in the NFL and first in the AFC in both rushing attempts and rushing yards. In the AFC Championship Game, Mendenhall helped lead the Steelers to the Super Bowl by rushing 27 times for 121 yards and a touchdown.

2.     In May 2008, Mr. Mendenhall signed an exclusive Talent Agreement with Hanesbrands, to allow Hanesbrands to use the services of Mr. Mendenhall to promote its products marketed under the Champion brand. In 2010, because of Mr. Mendenhall's success on the football field and his efforts to promote the Champion brand, Hanesbrands offered him a four-year extension of the Talent Agreement. Mr. Mendenhall accepted, and on August 31, 2010, the parties executed an "Amendment and Extension of Hanesbrands Inc. Talent Agreement," modifying the terms of the agreement and extending it for the period May 1, 2011 until April 30, 2015.

3.     Beginning in January 2010, Mr. Mendenhall had, with the apparent assent of Hanesbrands, used the Twitter social media platform ("Twitter") to be himself, to express his opinions and foster debate on controversial and non-controversial issues. Prior to May 5, 2011, Hanesbrands had never expressed any

2

disagreement or dissatisfaction with any of the subjects discussed or the opinions expressed by Mr. Mendenhall. However, on May 5, 2011, Hanesbrands advised Mr. Mendenhall by letter that effective May 13, 2011, it intended to unilaterally terminate Mr. Mendenhall's Talent Agreement. Hanesbrands indicated that it intended to take this action because it disagreed with certain statements made by Mr. Mendenhall on Twitter on May 2, 2011. Mr. Mendenhall disputed the action taken by Hanesbrands, and since May 13, 2011, Mr. Mendenhall has continued to be available to perform his duties under the Talent Agreement. Nonetheless, Hanesbrands has failed and refused to honor the Talent Agreement or make any further payments due Mr. Mendenhall.

4.     This case involves the core question of whether an athlete employed as a celebrity endorser loses the right to express opinions simply because the company whose products he endorses might disagree with some (but not all) of those opinions. Mr. Mendenhall brings this action to determine those rights, and to determine whether an unreasonable and inconsistent interpretation of contract terms by Hanesbrands can serve to muzzle his ability to express himself. The unilateral action taken by Hanesbrands is unreasonable, violates the express terms of the Talent Agreement and Extension, is contrary to the course of dealing between the parties with regard to Mr. Mendenhall's use of Twitter to freely express opinions on controversial and non-controversial subjects, violates the

covenant of good faith and fair dealing implied in every contract, and constitutes a breach of the Talent Agreement. Mr. Mendenhall seeks damages resulting from Hanesbrands' breach, in excess of $1 million.

## PARTIES

5.      Mr. Mendenhall is a permanent resident of Chicago, Illinois, and also maintains a residence in Pittsburgh, Pennsylvania, where he is employed by the Pittsburgh Steelers.

6.      Defendant Hanesbrands is a Maryland corporation with its principal place of business located at 1000 East Hanes Mill Road, Winston-Salem, NC 27105. Hanesbrands is engaged in the manufacture and sale of apparel, including athletic apparel marketed under the Champion brand.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a). There is complete diversity of citizenship between the Plaintiff, an Illinois resident, and the Defendant, a Maryland corporation with its principal place of business in Winston-Salem, North Carolina. Further, the amount in controversy exceeds $75,000, exclusive of costs or interest.

8.      This Court has personal jurisdiction over the Defendant because the Defendant is doing business in this state and specifically within this judicial district, the transaction that gives rise to the cause of action in this Complaint

occurred in this judicial district, and the Defendant has consented to jurisdiction in this district. Specifically, Section 23 of the Talent Agreement at issue in this case, provides as follows:

> <u>Governing Law and Venue</u>. This Agreement shall be governed by the laws of the State of New York and the Federal laws of the United States applicable therein, pertaining to contracts made and performed entirely within the State of North Carolina without regards to any conflicts of laws principles of any jurisdiction, and except only as may be required pursuant to Union Codes, HBI [Hanesbrands Inc.] and Mendenhall agree and consent that jurisdiction and venue of all matters relating to this Agreement shall be vested in the federal state and local courts, as applicable, within the State of North Carolina and County of Forsyth.

<u>See</u> Talent Agreement, Exhibit A, Section 23 at p. 10.

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) & (2) because the Defendant resides in this judicial district, a substantial part of the events giving rise to the claims herein occurred in this judicial district, and the Defendant is subject to personal jurisdiction in this judicial district. Moreover, the Defendant has consented to venue in this district pursuant to Section 23 of the Talent Agreement. <u>See</u> Talent Agreement, Exhibit A, Section 23 at p. 10.

## BACKGROUND FACTS

### <u>The Talent Agreement</u>

10.    On May 22, 2008, Mr. Mendenhall and Hanesbrands entered into an exclusive Talent Agreement for Hanesbrands to use the services of Mendenhall to advertise and promote Hanesbrands' products sold under the Champion brand.

The original Talent Agreement was effective for the term May 1, 2008 to April 30, 2011 (the "Initial Term"). <u>See</u> Exhibit A.

11.     Under the Talent Agreement, Mr. Mendenhall agreed during each year of the Initial Term to do the following: attend two advertising production sessions, where Mr. Mendenhall could be asked to participate in creation of audio recordings, photographs, video production for use in all forms of video media (including television commercials); perform other services reasonably necessary to produce content for use by Hanesbrands; attend two pre-production meetings; make as many as five personal appearances of up to two hours each as directed by Hanesbrands (during which he agreed to wear, handle, utilize and endorse Hanesbrands/Champion products if requested by Hanesbrands); and autograph up to 1000 items to be used by Hanesbrands for advertising, promoting, and marketing Champion brand products. Finally, Mr. Mendenhall agreed to "render the Services described herein in a first-class, competent and artistic manner to the best of his ability and pursuant to the reasonable direction of [Hanesbrands]." <u>See</u> Talent Agreement, Exhibit A, pp.1-2.

12.     Section 17 of The Talent Agreement also contained a provision regarding "Mendenhall's Reputation/Statements & Acts." Specifically, Section 17(a) provided that "If Mendenhall is arrested for and charged with, or indicted for or convicted of any felony or crime involving moral turpitude, then HBI shall have

6

the right to immediately terminate this Agreement." Section 17(b) required Mr. Mendenhall to give credit to and favorably mention Hanesbrands products when possible, and confirmed Mr. Mendenhall's belief as an endorser of Hanesbrands products that they are quality products which he endorses and recommends for purchase by the general public. Section 17(c) provided Hanesbrands the right under certain circumstances to terminate the Talent Agreement in the event that Mr. Mendenhall made "any statement or committed any act materially disparaging [Hanesbrands'] reputation or [Hanesbrands] products..." See Talent Agreement, Exhibit A, pp. 7.

13. During the Initial Term, Mr. Mendenhall performed all activities required and requested by Hanesbrands under the Talent Agreement, and Hanesbrands paid Mr. Mendenhall the amounts due him under the Talent Agreement, totaling $600,000 during the Initial Term. At no time during the Initial Term was Mr. Mendenhall in violation of any provision of the Talent Agreement, including any obligation or restriction contained in Section 17.

## The 2010 Extension of the Talent Agreement

14. Approximately two weeks before the commencement of the 2010 NFL season, Hanesbrands offered Mr. Mendenhall a four-year extension of the Talent Agreement (the "Extension"). Mr. Mendenhall agreed, and on August 31, 2010, Mendenhall and Hanesbrands executed the Extension, modifying certain

terms of the Talent Agreement immediately, and extending the Talent Agreement for the period May 1, 2011 through April 30, 2015 (the "Extension Term"). The Extension stated that "[e]xcept as otherwise specifically amended herein, all definitions, terms and conditions contained in the [original May 2008] Agreement shall apply during the Extension." <u>See</u> Extension, Exhibit B.

15.     The Extension amended certain clauses in the Talent Agreement, stating that during each year of the Extension Term, Mr. Mendenhall would be required to attend one production session, one pre-production meeting, make five (5) personal appearances, and provide 100 autographed items.  The Extension also contained a provision regarding "Social Media," contemplating that Mr. Mendenhall would make use of certain social media to express his "thoughts and views regarding his partnership with the Champion brand, playing in the NFL and off-the-field issues…" <u>See</u> Extension, Exhibit B at p. 1-2, and Section 1(b).

16.     The Extension also provided Mr. Mendenhall with additional compensation during the Extension Term.  The Extension required Hanesbrands to pay Mr. Mendenhall $220,000 for the first year of the Extension Term, $250,000 for the second year, $260,000 for the third year, and $290,000 for the fourth year, for total base compensation of $1,020,000.  Additionally, the Extension called for bonuses ranging from $10,000 to $75,000 for various achievements by Mr. Mendenhall on the field and recognition of those achievements, such as being

named the NFL's Most Valuable Player or rushing for 1,500 yards. As in the original Agreement, the Extension also provided for Mendenhall to receive $30,000 worth of Champion brand merchandise each year. See Extension, Exhibit B.

17. The Extension also altered Section 17(a) of the Talent Agreement pertaining to "Mendenhall's Reputation/Statements & Acts." Specifically, Section 3 of the Extension provided that Section 17(a) of the Talent Agreement was replaced with the following:

> If Mendenhall commits or is arrested for any crime or becomes involved in any situation or occurrence (collectively, the "Act") tending to bring Mendenhall into public disrepute, contempt, scandal or ridicule, or tending to shock, insult or offend the majority of the consuming public or any protected class or group thereof, then we shall have the right to immediately terminate this Agreement. [Hanesbrands'] decisions on all matters arising under this Section 17(a) shall be conclusive.

See Extension, Exhibit B at Section 3.

### Mr. Mendenhall's Use of Twitter

18. In January 2011, Mr. Mendenhall opened an account on the popular social networking website Twitter. Twitter offers a social networking and micro-blogging service, enabling its users to post and read messages called "tweets." Tweets are text-based posts of up to 140 characters, which are generated by the user and displayed on the user's profile page, which may be viewed by a Twitter user's "followers" and to which other Twitter users may respond.

9

19.     On his Twitter profile, Mr. Mendenhall describes himself as a "Conversationalist and Professional Athlete."  Mr. Mendenhall often issues tweets regarding his activities and his opinions on the NFL, current events, relationships, music, books, religion and other social issues.  At all times, Mr. Mendenhall's intention in posting tweets has been to present a wide array of ideas, encourage readers to think and consider alternate viewpoints, and generate open and honest discussion of those viewpoints.

20.     For example, on March 15, 2011, Mr. Mendenhall used his Twitter account to support certain opinions expressed by fellow NFL running back, Adrian Peterson.  During an interview, Mr. Peterson had compared the NFL labor situation to "modern-day slavery." (See "Adrian Peterson: NFL Like Modern Day Slavery,"           Huffington           Post,           March           15,           2011 http://www.huffingtonpost.com/2011/03/15/adrian-peterson-slavery-nfl_n_836090.html.)

21.     Following Mr. Peterson's comments, Mr. Mendenhall issued the following series of tweets on March 15, 2011:

> @Adrian Peterson is correct in his analogy of this game.  It is a lot deeper than most people understand.
>
> @Adrian Peterson Anyone with knowledge of the slave trade and the NFL could say that these two parallel eachother.

22.    In response to his tweets regarding Mr. Peterson's comments, Mr. Mendenhall received responses from other Twitter users, which were posted on his Twitter page.  Some of the responses disagreed with Mr. Mendenhall's comments. Specifically, on March 15 and 16, comments posted on Twitter; called Mr. Mendenhall "dumb and uneducated" and "overpaid and undereducated," and told Mendenhall that "if [the] slave trade and [NFL] parallel each other, quit then. . .;" and called Mendenhall's tweets " a dumba## comment."

23.    On March 16, 2011, Mendenhall responded to this criticism of his comments by issuing another series of tweets:

> *The easiest thing for a person to do when they don't understand something is to call it crazy.*

> *When you look over the course of history at any great thinker, they had ideas that were not common at the time.*

> *And people called them stupid, dumb, ignorant.  That's because they couldn't comprehend a new idea.*

> *If you look back and [dissect] what I said, I didn't say that the NFL was slavery, I said that they parallel [each other].  Look up the word parallel.*

> *This means that they're not the same thing, but they run the same course. These paths will never cross, but they mirror [each other].*

> *Learn to LISTEN before you pass judgment.  Because speaking without knowledge of subject is truly ignorant.*

> *Outside of the dollar amount you see on [TV], you don't know what's going on with the innerworkings of this business.*

> *I don't know what goes on at your job.  But how dumb would I sound if I*

*read about it in the newspaper and tried to tell you what's going on?*

24. On March 27, Mr. Mendenhall responded to additional criticism of his tweets. Mr. Mendenhall tweeted again:

> *[p]eople really be getting mad at me on Twitter... I find that funny...*
>
> *I guess when you join the NFL, you revoke your freedom of speech.*

25. Following Mr. Mendenhall's tweets regarding Mr. Peterson's comments, Hanesbrands took no action. Hanesbrands at no time suggested that it disagreed with Mr. Mendenhall's comments or that his tweets were in any way inconsistent with the values of the Champion brand or his obligations under the Talent Agreement, or that because of his tweets, Hanesbrands believed Mr. Mendenhall could no longer continue to effectively communicate on behalf of and represent Champion with consumers.

26. On April 7, 2010, Mr. Mendenhall again used Twitter to engage in a debate with another Twitter user about religion, particularly the Islamic faith. After posting some references entitled "<u>Islamic Thinking</u> Islamic Thoughts" Mr. Mendenhall posted the following statements regarding the Islamic religion in response to the Twitter user @jmarinara:

> <u>*@jmarinara*</u> *there is more than one truth. Everyone has their own beliefs, but if your OPEN you can achieve greater understanding*
>
> <u>*@jmarinara*</u> *you don't know enough about Islam to say there is ZERO truth to it!!*

*@jmarinara they're not total opposites, that shows how little you know. But both are man-made which makes neither one completely true.*

*@jmarinara I'm not saying you need to change your beliefs, but I will say that if you have a closed mind, you'll never learn anything…*

*@jmarinara an article about Islam, written by an American Christian White Man. That's real convenient..I give up, you win…*

27.     Following Mr. Mendenhall's tweets regarding the Islamic faith, Hanesbrands took no action.  Hanesbrands at no time suggested that it disagreed with Mr. Mendenhall's comments or that his tweets were in any way inconsistent with the values of the Champion brand or his obligations under the Talent Agreement, or that because of his tweets, Hanesbrands believed Mr. Mendenhall could no longer continue to effectively communicate on behalf of and represent Champion with consumers.

28.     Further, on April 21, Mr. Mendenhall issued two tweets about women and parenting.  Mr. Mendenhall tweeted:

*Women are some of the most SELFISH creatures I know!*

*If [you're] not willing to put your CHILD FIRST, don't have one.*

29.     Following Mr. Mendenhall's April 21 tweets regarding women and parenting, Hanesbrands took no action.  Hanesbrands at no time suggested that it disagreed with Mr. Mendenhall's comments or that his tweets were in any way inconsistent with the values of the Champion brand or his obligations under the Talent Agreement, or that because of those tweets, Hanesbrands believed Mr.

Mendenhall could no longer continue to effectively communicate on behalf of and represent Champion with consumers.

30.    Again on May 1, 2011, Mr. Mendenhall tweeted about women and relationships.

> *Women, if you don't #respect your man someone else will.*
>
> *Going down on your man IS optional.  It's either gonna be you, OR some other chick.*

31.    Following Mr. Mendenhall's May 1 tweets regarding women and relationships, Hanesbrands took no action.  Hanesbrands at no time suggested that it disagreed with Mr. Mendenhall's comments or that his tweets were in any way inconsistent with the values of the Champion brand or his obligations under the Talent Agreement, or that because of those tweets, Hanesbrands believed Mr. Mendenhall could no longer continue to effectively communicate on behalf of and represent Champion with consumers.

32.    In addition to the examples contained in Paragraphs 20-31 of this Complaint, Mr. Mendenhall posted tweets on many other subjects during the term of the Talent Agreement, including controversial subjects, non-controversial subjects and routine daily activities. Hanesbrands at no time prior to May 2011 suggested that it disagreed with Mr. Mendenhall's comments or that his tweets were in any way inconsistent with the values of the Champion brand or his obligations under the Talent Agreement, or that because of any tweets,

Hanesbrands believed Mr. Mendenhall could no longer continue to effectively communicate on behalf of and represent Champion with consumers.

### Mendenhall's Tweets on May 2 and 4, 2010

33.    On Sunday, May 1, 2011, President Obama announced that the fugitive Osama bin Laden had been killed in a firefight with United States military forces in Pakistan.    In response to the announcement, spontaneous public "celebrations" broke out across the country, most notably on college campuses, outside the White House in Washington, DC, at Times Square in New York City, and at New York City's Ground Zero, one of the sites of the terrorist attacks perpetrated against the United States on September 11, 2001.

34.    The public "celebrations" of the death of Osama bin Laden were considered by many Americans to be offensive, unseemly and inappropriate.

35.    The next day, May 2, 2011, Mr. Mendenhall issued a series of tweets concerning the public celebrations of bin Laden's death:

*What kind of person celebrates death?  It's amazing how people can HATE a man they never even heard speak.  We've only heard one side...*

*I believe in God.  I believe we're ALL his children.  And I believe HE is the ONE and ONLY judge.*

*Those who judge others, will also be judged themselves.*

*For those of you who said we want to see Bin Laden burn in hell and piss on his ashes, I ask how would God feel about your heart?*

*There is not an ignorant bone in my body.  I just encourage you to #think*

*@dkeller23 We'll never know what really happened. I just have a hard time believing a plane could take a skyscraper down demolition style.*

36. As with other subjects Mr. Mendenhall had tweeted about in the past, he received some comments in support of his views and some opposed. In response to some negative reaction to his May 2 tweets, Mr. Mendenhall issued a letter of explanation of the tweets on May 4, 2011, that was linked from his Twitter page. In his linked comments, Mr. Mendenhall wrote:

*I appreciate those of you who have decided to read this letter and attain a greater understanding of my recent twitter posts. I see how they have gotten misconstrued, and wanted to use this outlet as a way to clear up all things that do not truthfully represent myself, what I stand for personally, and any organization that I am a part of.*

*First, I want people to understand that I am not in support of Bin Laden, or against the USA. I understand how devastating 9/11 was to this country and to the people whose families were affected. Not just in the US, but families all over the world who had relatives in the World Trade Centers. My heart goes out to the troops who fight for our freedoms everyday, not being certain if they will have the opportunity to return home, and the families who watch their loved ones bravely go off to war. Last year, I was grateful enough to have the opportunity to travel over seas and participate in a football camp put on for the children of US troops stationed in Germany. It was a special experience. These events have had a significant impact in my life.*

"What kind of person celebrates death? It's amazing how people can HATE a man they have never even heard speak. We've only heard one side..."

*This controversial statement was something I said in response to the amount of joy I saw in the event of a murder. I don't believe that this is an issue of politics or American pride; but one of religion, morality, and human ethics. In the bible, Ezekiel 33:11 states, "Say to them, 'As surely as I live, declares the Sovereign LORD, I take no pleasure in the death of the*

16

*wicked, but rather that they turn from their ways and live. Turn! Turn from your evil ways..." I wasn't questioning Bin Laden's evil acts. I believe that he will have to face God for what he has done. I was reflecting on our own hypocrisy. During 9/11 we watched in horror as parts of the world celebrated death on our soil. Earlier this week, parts of the world watched us in horror celebrating a man's death.*

*Nothing I said was meant to stir up controversy. It was my way to generate conversation. In looking at my timeline in its entirety, everything that I've said is with the intent of expressing a wide array of ideas and generating open and honest discussions, something I believe we as American citizens should be able to do. Most opinions will not be fully agreed upon and are not meant to be. However, I believe every opinion should be respected or at least given some thought. I apologize for the timing as such a sensitive matter, but it was not meant to do harm. I apologize to anyone I unintentionally harmed with anything that I said, or any hurtful interpretation that was made and put in my name.*

*It was only meant to encourage anyone reading it to think.*

37.     Since posting his tweets and linked comments on May 2 and May 4, Mr. Mendenhall has received a tremendous number of Twitter messages supporting his views, including the following:

*@R_Mendenhall At first I was upset about ur tweets but like ur goal it got me thinkin mad respect for u man Love a man of God*

*@R_Mendenhall Forgiveness makes you a stronger and better person..holding [grudges] and not learning about the person him/herself will never get you anywhere*

*@R_Mendenhall That's the purpose of life to manifest ideas & create a better world for the future! #thinking leads to ideas, ideas = change!*

*@R_Mendenhall I wish people would stop disagreeing with you and realize that by thinking, they are proving you right. You are so refreshing.*

17

*@R_Mendenhall seriously says some of the most inspiring & truthful things I've heard in a while, he changed my opinion on athletes.*

*i would give about anything just to have a conversation with @r_mendenhall. he speaks some of the realest words i've ever heard.*

*@R_Mendenhall // appreciate your thought provoking tweets. it's time people stop living a selfishly blind life.*

*@R_Mendenhall you used to just be my favorite player on my favorite team, now you are just one of my favorite people. #inspiration*

*@R_Mendenhall I've never been a Steelers fan, but I have more respect for you than any other professional athlete I can think of.*

*@R_Mendenhall your mental state should be the prototype for not just athletes but humans in general.*

### **Hanesbrand's Decision to Terminate Talent Agreement**

38.    Following Mr. Mendenhall's tweets on May 2 and 4, 2010, on May 5, 2011, L. Lynnette Fuller-Andrews, Associate General Counsel of Hanesbrands, sent a letter to Rob Lefko, one of Mr. Mendenhall's representatives at Priority Sports and Entertainment.  The letter informed Mr. Lefko that effective Friday, May 13, 2011, Hanesbrands was purportedly terminating Mr. Mendenhall's affiliation with Hanesbrands under the Talent Agreement and Extension "pursuant to Paragraph 17(a) of Agreement."  See Letter Dated May 5, 2011, Exhibit C.

39.    On information and belief, the following day, May 6, 2011, Hanesbrands also sent a written statement concerning Mr. Mendenhall to ESPN.com.  While the statement paid lip service to Mr. Mendenhall's "right to

express sincere thoughts regarding potentially controversial topics," Hanesbrands stated it nonetheless intended to end its business relationship with Mr. Mendenhall:

> Champion is a strong supporter of the government's efforts to fight terrorism and is very appreciative of the dedication and commitment of the U.S. Armed Forces. Earlier this week, Rashard Mendenhall, who endorses Champion products, expressed personal comments and opinions regarding Osama bin Laden and the September 11 terrorist attacks that were inconsistent with the values of the Champion brand and with which we strongly disagreed. In light of these comments, Champion was obliged to conduct a business assessment to determine whether Mr. Mendenhall could continue to effectively communicate on behalf of and represent Champion with consumers.
>
> While we respect Mr. Mendenhall's right to express sincere thoughts regarding potentially controversial topics, we no longer believe that Mr. Mendenhall can appropriately represent Champion and we have notified Mr. Mendenhall that we are ending our business relationship. Champion has appreciated its association with Mr. Mendenhall during his early professional football career and found him to be a dedicated and conscientious young athlete. We sincerely wish him all the best.

See Statement, Exhibit D.

40.     On May 9, 2011, Rick Smith, general counsel and President of Priority Sports and Entertainment, responded to Ms. Fuller-Andrews May 5, 2011 letter on behalf of Mr. Mendenhall.   In his letter, Mr. Smith stated Mr. Mendenhall's position that Hanesbrands has no legal right to terminate the Talent Agreement and deems the Talent Agreement to be in full force and effect.  See Letter Dated May 9, 2011, Exhibit E.

41.     Hanesbrands responded to Mr. Smith's May 9, 2011 letter by letter dated May 11, 2011 from L. Lynnette Fuller-Andrews.  In her letter, Ms. Fuller-Andrews wrote in pertinent part:

> In light of Mr. Mendenhall's series of Tweets regarding the death of Osama bin Laden and the events of September 11, 2001, we have concluded that his actions meet the standards set forth in the Agreement of bringing Mr. Mendenhall "into public disrepute, contempt scandal or ridicule, or tending to shock, insult or offend a majority of the consuming public or any protected class or group thereof…." It is also our opinion that Mr. Mendenhall can no longer be an effective spokesperson for the Champion brand, in light of these actions.

See Letter of May 11, 2011, Exhibit F.

42.     Mr. Smith wrote to Hanesbrands again on May 18, 2011, demanding full payment of the first installment due Mr. Mendenhall under the Talent Agreement, which Hanesbrands had reduced and pro-rated to May 13, 2011, the date of its purported termination of the Talent Agreement.  Mr. Smith further advised Hanesbrands that it was in breach of the Talent Agreement for failure to make full payment of the first installment payment.  See Letter Dated May 18, 2011, Exhibit G.  Since May 20, 2011, Hanesbrands has failed and refused to honor the Talent Agreement or make any further payment to Mr. Mendenhall.

43.     Hanesbrands' failure to honor the Talent Agreement and decision under section 17(a) is unreasonable, violates the express terms of the Talent Agreement and Extension, is contrary to the course of dealing between the parties with regard to Mr. Mendenhall's use of Twitter to freely express opinions on

controversial subjects, violates the covenant of good faith and fair dealing implied in every contract, and constitutes a breach of the Talent Agreement and Extension.

44. As a result of Hanesbrands' breach, Mr. Mendenhall has incurred damages now and in the future in an amount to be proved at trial in excess of $1 million.

## COUNT I

### (Breach of Talent Agreement and Extension)

45. Plaintiff restates and realleges Paragraphs 1 through 44 of this Complaint as this Paragraph 45.

46. The Talent Agreement and Extension constitute a valid and enforceable contract between Plaintiff and Hanesbrands.

47. Plaintiff has performed all contractual duties required of him under the Talent Agreement and Extension.

48. By its actions purporting to terminate the Talent Agreement and Extension under Section 17(a), and by its failure and refusal to pay amounts due Mr. Mendenhall, Defendant Hanesbrands is in breach of the Talent Agreement and Extension.

49. As a result of Defendant's breach, Plaintiff has suffered and will in the future suffer damages in an amount to be proven at trial in excess of $1 million, not including interest and costs.

WHEREFORE, the Plaintiff respectfully requests that the Court grant a trial by jury on all issues so triable and enter judgment in favor of the Plaintiff and against the Defendant in an amount to be proven at trial in excess of $1 million, together with costs, interest, and such other and further relief as this Court deems appropriate.

## **Jury Demand**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

Respectfully submitted, this the 18th day of July, 2011.

Steven J. Thompson
sjthompson@uhlaw.com
Richard H. Tilghman IV
rtilghman@uhlaw.com
UNGARETTI & HARRIS LLP
3500 Three First National Plaza
Chicago, IL 60602
Telephone: 312-977-4400
Facsimile: 312-977-4405

and

/s/ David W. Sar
David W. Sar
N.C. State Bar No. 23533
dsar@brookspierce.com

/s/ Eric M. David
Eric M. David
N.C. State Bar No. 38118

22

edavid@brookspierce.com
BROOKS, PIERCE, MCLENDON,
  HUMPHREY & LEONARD, L.L.P.
230 North Elm Street, Suite 2000
Greensboro, NC  27401
Telephone:    336-373-8850
Facsimile:    336-378-1001

*Attorneys for Rashard Mendenhall*