UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF NORTH CAROLINA

Civil Action No. 11-cv-570

RASHARD MENDENHALL,

Plaintiff,

         v.

HANESBRANDS INC.

Defendant

JURY TRIAL DEMANDED

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR
JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT/NATURE OF THE CASE ................................... 1

STATEMENT OF THE FACTS ............................................................... 3

    The Extension Agreement ............................................................. 5

    Mendenhall's Public Statements .................................................... 6

ARGUMENT ....................................................................................... 9

I.      STANDARD OF REVIEW ............................................................ 9

II.    THE UNDISPUTED FACTS DEMONSTRATE THAT HANESBRANDS IS ENTITLED TO JUDGMENT AS A MATTER OF LAW .................... 11

III.   TERMINATION OF THE AGREEMENT UNDER PARAGRAPH 17(A) RELIEVED HANESBRANDS OF ANY FURTHER PAYMENT OBLIGATIONS ....................................................................... 16

CONCLUSION ................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*805 Third Ave. Co. v. M.W. Realty Assocs.*,
   58 N.Y.2d 447 (1983) ............................................................................ 10

*Alexander v. City of Greensboro*,
   No. 1:09-CV-293, 2011 U.S. Dist. LEXIS 85782 (M.D.N.C. Aug. 3, 2011) ............. 10

*Ark Bryant Park Corp. v. Bryant Park Restoration Corp.*,
   285 A.D.2d 143 (1st Dep't 2001) .............................................................. 10

*Eagle Nation, Inc. v. Market Force, Inc.*,
   180 F. Supp. 2d 752 (E.D.N.C. 2001)........................................................ 10

*FreecycleSunnyvale v. Freecycle Network*,
   626 F.3d 509 (9th Cir. 2010) .................................................................. 12

*Galaviz v. Post-Newsweek Stations San Antonio, Inc.*,
   380 Fed. App'x. 457 (5th Cir. 2010) ......................................................... 12

*Hodgin v. Brighton*,
   196 N.C. App. 126, 674 S.E.2d 444 (2009).................................................. 10

*Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*,
   549 F.2d 368 (5th Cir. 1977) .................................................................. 12

*Lincoln Nat'l Life Ins. Co. v. Condellone*,
   No.1:07-cv-00800, 2008 U.S. Dist. LEXIS 77617 (M.D.N.C. Oct. 1, 2008) .............. 9

*Murray v. City of Fayetteville*,
   No. 5:05-cv-861-BR, 2006 U.S. Dist. LEXIS 88115 (E.D.N.C. Aug. 6, 2006)............ 9

*Nader v. ABC Television, Inc.*,
   150 Fed. App'x. 54 (2d Cir. 2005).............................................................. 12

*Prime TV, LLC v. Travelers Ins. Co.*,
   223 F. Supp. 2d 744 (M.D.N.C. 2002) ........................................................ 9

*Siegel v. Chicken Delight, Inc.*,
   448 F.2d 43 (9th Cir. 1971), *cert. denied*, 405 U.S. 955 (1972).................................. 12

**OTHER AUTHORITIES**

19 Williston on Contracts 45:45 ........................................................................ 12

Fed. R. Civ. P. 1 ............................................................................................... 17

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 9

Fed. R. Civ. P. 12(c) ............................................................................... 1, 9, 10

iii

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure and Local Rules 7.2 and 7.3, Defendant Hanesbrands Inc. ("Hanesbrands"), by its attorneys, hereby submits this memorandum in support of its motion for judgment on the pleadings on Plaintiff Rashard Mendenhall's ("Plaintiff" or "Mendenhall") Complaint.

## PRELIMINARY STATEMENT/NATURE OF THE CASE

In this straightforward contract case Plaintiff asserts in dramatic fashion that this case is essentially about the First Amendment -- "the core question of whether an athlete employed as a celebrity endorser loses the right to express opinions simply because the company whose products he endorses might disagree with some (but not all) of those opinions." Mr. Mendenhall is free to express any opinion he chooses and his contract with Hanesbrands does not deprive him of any of his First Amendment rights, but Plaintiff posits the wrong question.[1] (Complaint ¶ 3). The correct issue for this Court is whether a trademark owner that has expended considerable time and resources building up substantial goodwill associated with its famous brand is required to continue to pay and employ a celebrity endorser who the company believes is no longer an effective spokesperson for the brand, when the endorsement contract at issue gives the company the unambiguous and conclusive right to terminate his services if, in the company's estimation, the endorser's public statements tended to cause him to become the subject of

---

[1] In fact, Plaintiff only raises the specter of the First Amendment to distract the Court from the plain language of his employment contract. As Plaintiff well knows, there is no "state action" at issue here, since Hanesbrands is not a government entity, and private parties routinely enter contracts to limit speech (e.g., non-disclosure agreements, non-disparagement agreements).

1

public disrepute, contempt, scandal or ridicule, or have otherwise alienated members of the consuming public.

In short, this dispute arises from Plaintiff's displeasure with Hanesbrands' decision to lawfully exercise its contractual right to terminate Plaintiff's talent services agreement, as a result of Plaintiff's publication of controversial statements concerning the death of Osama bin Laden and Plaintiff's outrageous intimation that the United States government may have had a hand in toppling the twin towers of the World Trade Center on 9/11. Indeed, Plaintiff went so far as to say that he is not sure Osama bin Laden played any role in the 9/11 attacks. Plaintiff had the right to make the statements he did, but Hanesbrands had the right to terminate the contract as a result of the backlash caused by those outrageous statements. Plaintiff may now regret having made his controversial statements (discussed more fully below) or may simply regret having signed a contract giving Hanesbrands the termination right, but such regret does not give rise to a viable breach of contract claim.

It is black-letter law that this Court should interpret the contract language at issue as a matter of law. Applying the undisputed facts to the morals clause at issue, Hanesbrands was well within its rights to terminate the Talent Agreement in view of Plaintiff's highly publicized statements. Moreover there is no reason or public policy at all for this Court to construe the contract other than by its plain terms and their plain meanings. Indeed, upholding the contract is entirely consistent with U.S. trademark law.

Under U.S. trademark law, trademark owners are not only permitted to control the quality and image of their brands, the law imposes an affirmative obligation upon them to do so.

In a nutshell, Hanesbrands lawfully bargained for the unfettered right to control the quality and image of the famous CHAMPION® brand, including the right to terminate the contractual relationship it had with Mr. Mendenhall, under the circumstances plainly met here. Even accepting all of the allegations of the complaint as true, from a simple review of the contract and a review of the highly controversial statements that Plaintiff admits to having made, it is abundantly clear that Hanesbrands is entitled to judgment on the pleadings.

## STATEMENT OF THE FACTS

Hanesbrands is a global consumer goods company and pioneer in high-performance athletic wear, with a portfolio of leading apparel brands, including the CHAMPION® brand.

In May of 2008, shortly after Plaintiff was drafted by the Pittsburgh Steelers in the first round of the NFL draft, the Parties entered into a Talent Agreement (the "Talent Agreement"), whereby Mendenhall agreed to advertise and promote, and to allow Hanesbrands to use his name and likeness to advertise and promote, CHAMPION® products, in exchange for a generous compensation package to be paid by Hanesbrands. (Complaint, Ex. A at 2-3 and B at 1-3). Because trademark owners owe a duty to the public to control the nature and quality of their goods and because, under the agreement, Plaintiff was to essentially be an ambassador of Hanesbrands and the CHAMPION®

brand, his public image and reputation were an essential part of the services he would be

providing to Hanesbrands. Therefore, in order to protect the goodwill associated with

Hanesbrands' CHAMPION® branded products, Paragraph 17 of the Talent Agreement,

entitled "Mendenhall's Reputation/Statement & Acts," contained a number of provisions

prohibiting Mendenhall from taking certain actions and/or making certain types of

statements. (Complaint, Ex. A at 7).

     For instance, subsection (c) prohibited Mendenhall from making "any statement or

commit[ting] any act materially disparaging of HBI's reputation or HBI's Products…"

(*Id.*) Similarly, subsection (b) required Mendenhall to "represent[s] and warrant[s] that

he will not make or approve any knowingly false or misleading statements related to the

[Champion] Products or otherwise in connection with his performance of the Services."

(*Id.*) In addition to the above, Paragraph 17 also contained a "morals clause," in

subsection (a), which stated:

> If Mendenhall is arrested for and charged with, or indicted for
> or convicted of any felony or crime involving moral
> turpitude, then HBI shall have the right to immediately
> terminate this Agreement.

(*Id.*)

     Pursuant to subsection (d), Hanesbrands was required to exercise its right to

terminate the Agreement under any subsection of Paragraph 17, "if at all, not later than

one hundred and twenty (120) days after the facts giving rise to such right under this

Paragraph are brought to HBI's attention." (*Id.*) Thus, Hanesbrands had the right, but

not the obligation, to exercise its termination right, and such right would be in effect for

up to four months after Hanesbrands became aware that Plaintiff had committed one or more of the acts specified in 17(a)-(c).

**The Extension Agreement**

On or about August 31, 2010, the parties entered into the Amendment and Extension of Hanesbrands Inc. Talent Agreement (the "Extension Agreement"), which modified a number of provisions of the Talent Agreement, and extended the term of the Talent Agreement for an additional four years.

One of the provisions changed by the Extension Agreement was Paragraph 17. Section 3 of the Extension Agreement replaced the prior Paragraph 17(a) with the following provision:

> If Mendenhall commits or is arrested for any crime <u>or becomes involved in any situation or occurrence (collectively, the "Act") tending to bring Mendenhall into public disrepute, contempt, scandal or ridicule, or tending to shock, insult or offend the majority of the consuming public</u> or any protected class or group thereof, <u>then we shall have the right to immediately terminate this Agreement. HBI's decision on all matters arising under this Section 17(a) shall be conclusive.</u>

(Complaint ¶ 17 and Ex. B at 4; Answer ¶ 17) (emphasis added).

Thus, whereas under the prior iteration of 17(a), Hanesbrands' termination right was only triggered in the event that Plaintiff was arrested and charged with, indicted for or convicted of, a felony or crime of moral turpitude, Hanesbrands specifically bargained for the new Section 17(a), which broadened the scope of Hanesbrands' termination rights to include other situations or occurrences which would potentially result in damage to Plaintiff's public image or reputation.

5

Pursuant to Section 4 of the Extension Agreement, unless otherwise specifically stated in the Extension Agreement, all other terms and conditions of the Talent Agreement remained in full force and effect. (Complaint, Ex. B at 4). With the exception of replacing subsection (a) as specified above, the Extension Agreement made no other changes to Paragraph 17.

**Mendenhall's Public Statements**

On Sunday night, May 1, 2011, President Obama made a televised announcement that U.S. military forces had located and killed Osama bin Laden in Pakistan. (Complaint, ¶ 33; Answer ¶ 33). The following day, May 2, 2011, Mendenhall posted a number of comments to his Twitter feed criticizing persons who were perceived to be "celebrating" the news of Osama bin Laden's death and expressing his doubts as to the cause of the terrorist attacks of September 11, 2001 (the "9/11 Tweets"), including:

- *What kind of person celebrates death? It's amazing how people can HATE a man they never even heard speak. We've only heard one side….*

- *For those of you who said we want to see Bin Laden burn in hell and piss on his ashes, I ask how would God feel about your heart?*

- *I'm not convinced he was even behind the attacks we have really seen no evidence to prove it other than the gov telling us*

- *@dkeller23 We'll never know what really happened. I just have a hard time believing a plane could take a skyscraper down demolition style.*

(Complaint ¶ 35, Answer ¶ 35 and Exs. 2, 3 and 4).

6

Plaintiff's statements caused an almost instantaneous public uproar. While Plaintiff admits to receiving "some comments in support of his views and some opposed," not surprisingly, Plaintiff's Complaint includes only examples of the supportive comments he received. (Complaint ¶ 36). However, the negative public reaction to Plaintiff's May 2, 2011 "tweets" is well-documented by the various news articles available from the week of May 2nd. (*See, e.g.,* Answer, Exs. 7, 8, 9 and 10). Indeed, the public disapproval of Plaintiff's statements was so severe that Plaintiff deleted the last two tweets listed above from his Twitter feed (Answer, Ex. 2) – but not before they, and the rest of his comments about the death of bin Laden, had been picked up by the national media (*see, e.g.,* Answer Exs. 3, 4, 7, 8, 9 and 10). Two days after posting the 9/11 Tweets, with the public furor over his remarks unabated, Plaintiff created a blog post entitled "Clarification," in which Plaintiff attempted to provide an explanation for his statements. (Complaint ¶ 36; Answer, Ex. 5). Plaintiff made a blanket apology "to anyone [he] unintentionally harmed" by posting the statements, thus acknowledging that his statements may have scandalized, insulted, shocked or offended people. *Id.*

Unable to ignore the public ridicule and outrage over the 9/11 Tweets, on May 5, 2011, Hanesbrands notified Plaintiff by letter, through his agent at Priority Sports, that Hanesbrands was exercising its Paragraph 17(a) right to terminate the Agreement. (Complaint ¶ 38 and Ex. C). Plaintiff objected to Hanesbrands' termination of the Talent Agreement. In a letter dated May 9, 2011, Rick Smith, Plaintiff's agent and authorized

attorney at Priority Sports asserted that it was Plaintiff's position that Hanesbrands "has no legal right to terminate the Talent Agreement" and that he "deems the Talent Agreement to be in full force and effect." (Complaint ¶ 41 and Ex. E). Hanesbrands responded to Mr. Smiths' letter on May 11th, stating that:

> In light of Mr. Mendenhall's series of Tweets regarding the death of Osama bin Laden and the events of September 11, 2001, we have concluded that his actions meet the standard set forth in the Agreement of bringing Mr. Mendenhall into "public disrepute, contempt, scandal or ridicule, or tending to shock, insult or offend a majority of the consuming public or any protected class thereof. . . .

(Complaint ¶ 41 and Ex. F). The letter further pointed out that "Section 17(a), as amended, provides that HBI's decision to terminate the Agreement in reliance on this provision 'shall be conclusive' with respect all such matters." (*Id.*) Hanesbrands also notified Mr. Smith that it would be sending Plaintiff a payment of $7,836.00, representing the amount due to him under the contract for his services for the period of May 1st through May 13th (the effective date of his termination). (*Id.*)

On May 18th, Plaintiff's agent and attorney, Mr. Smith notified Hanesbrands by letter that Plaintiff was in receipt of the $7,836.00 payment. (Complaint, Ex. G). However, Plaintiff asserted that, under Paragraph 2 of the Extension Agreement, Plaintiff was owed a payment of $55,000, and thus considered the $7,836.00 only a partial payment of the amount allegedly due and owing him. (*Id.*) Mr. Smith further asserted that it considered Hanesbrands to be in breach of Paragraph 19(b) of the Talent Agreement, as a result of Hanesbrands' failure to make the full $55,000 payment. On

May 20, 2011 Ms. Fuller-Andrews replied to Mr. Smith's May 18th letter (Answer, Exhibit 6), reiterating Hanesbrands' position that the Talent Agreement had been terminated and that no further amounts were due to Plaintiff under the Talent Agreement. Almost two months later, on July 18, 2011, Plaintiff  filed the instant matter, alleging that Hanesbrands' termination of Mr. Mendenhall and alleged failure to pay amounts allegedly due to him, constituted a breach of the Talent Agreement, and seeking in excess of $1 million in damages.

## ARGUMENT

## I.     STANDARD OF REVIEW

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party may move for judgment on the pleadings "[a]fter the pleadings are closed, but early enough not to delay trial."  Fed. R. Civ. P. 12(c).  When ruling on a motion for judgment on the pleadings, "the district court applies the same standard under Rule 12(c) as it applies under Fed. R. Civ. P. 12(b)(6)."  *Murray v. City of Fayetteville*, No. 5:05-cv-861-BR, 2006 U.S. Dist. LEXIS 88115, at *5 (E.D.N.C. Aug. 6, 2006).  Thus, "judgment on the pleadings is appropriate if, taking the non-moving party's allegations as true, the movant clearly establishes that no material issue of fact remains to be resolved and that the movant is entitled to judgment as a matter of law."  *Prime TV, LLC v. Travelers Ins. Co.*, 223 F. Supp. 2d 744, 749 (M.D.N.C. 2002).  *See also Lincoln Nat'l Life Ins. Co. v. Condellone*, No.1:07-cv-00800, 2008 U.S. Dist. LEXIS 77617, at *4 (M.D.N.C. Oct. 1, 2008) (stating a Rule 12(c) motion is properly granted when "material facts are admitted or not

controverted in the pleadings, and only questions of law remain to be decided by a court.").

On a Rule 12(c) motion the Court may consider documents attached to the pleadings without converting the motion to one for summary judgment, provided that they are integral to plaintiff's claims and their authenticity is not in question. *See, e.g., Alexander v. City of Greensboro,* No. 1:09-CV-293, 2011 U.S. Dist. LEXIS 85782, at *14 (M.D.N.C. Aug. 3, 2011) (holding that on a Rule 12(c) motion, the court may consider an exhibit attached to defendant's Answer because "it is attached to the pleadings . . .it is central to Plaintiffs' claims . . . and Plaintiffs do not dispute its authenticity." (citations omitted)); *Eagle Nation, Inc. v. Market Force, Inc.*, 180 F. Supp. 2d 752, 754 (E.D.N.C. 2001) (stating that, on a Rule 12(c) motion, the court may "consider the documents and exhibits attached to and incorporated into the pleadings themselves").

Furthermore, "[i]nterpretation of [a] contract is a legal matter for the court." *805 Third Ave. Co. v. M.W. Realty Assocs.*, 58 N.Y.2d 447, 451 (1983). When interpreting the contract "its provisions establish the rights of the parties and prevail over conclusory allegations of the complaint." *See also Ark Bryant Park Corp. v. Bryant Park Restoration Corp.*, 285 A.D.2d 143, 150 (1st Dep't 2001) ("interpretation of an unambiguous contract is a question of law for the court, and the provisions of the contract

10

delineating the rights of the parties prevail over the allegations set forth in the complaint.").[2]

## II.  THE UNDISPUTED FACTS DEMONSTRATE THAT HANESBRANDS IS ENTITLED TO JUDGMENT AS A MATTER OF LAW

As the pleadings in this matter make clear, the parties are in agreement on the only material facts relevant to the Plaintiff's claims, namely: 1) the contents of the Talent Agreement; 2) the contents of Plaintiff's statements concerning Bin Laden and September 11th; and 3) there was negative public reaction to Plaintiff's statements.

Both Plaintiff and Hanesbrands agree that in May 2008, Plaintiff signed the Talent Agreement, pursuant to which Plaintiff would perform certain services to Hanesbrands in connection with the promotion and endorsement of Hanesbrands' CHAMPION® brand products.  (Complaint ¶¶ 10-11; Answer ¶¶ 10-11).  The parties further agree that thereafter, in August 2010, Plaintiff and Hanesbrands executed the Amendment Agreement, which, among other things, modified Paragraph 17(a) to expand the circumstances under which Plaintiff's actions or behavior would trigger Hanesbrands' right to terminate the Agreement.  (Complaint ¶ 17; Answer ¶ 17).

---

[2] Pursuant to Paragraph 23 of the Talent Agreement, the Agreement is to be construed in accordance with the laws of New York.  (Complaint, Ex. A at 10).  In any event, New York and North Carolina law are in agreement on this issue.  *See, e.g., Hodgin v. Brighton,* 196 N.C. App. 126, 128, 674 S.E.2d 444, 446 (2009) ("Where the language of a contract is plain and unambiguous, the construction of the agreement is a matter of law; and the court ... must construe the contract as written, in the light of the undisputed evidence as to the custom, usage, and meaning of its terms.").

Under Paragraph 17(a), as modified by Section 3 of the Extension Agreement, Hanesbrands had the right to immediately terminate the Agreement if Plaintiff performed any act that <u>tended to</u>: a) bring himself into public disrepute, contempt, scandal or ridicule; or b) shock, insult or offend the majority of the consuming public.  (Complaint ¶ 17 and Ex. B at 4; Answer ¶ 17).  Moreover, paragraph 17(a), as modified by Section 3 of the Extension Agreement, clearly states that "HBI's decision on all matters arising under this Paragraph 17(a) shall be conclusive."  (Complaint, Ex. B at 4).

Plaintiff does not dispute the validity of Paragraph 17(a), as modified by the Extension Agreement and, in any event, contractual "morals clauses," such as the one contained in the Talent Agreement are generally enforceable.  *See, e.g., Nader v. ABC Television, Inc.*, 150 Fed. App'x. 54, 56 (2d Cir. 2005) ("Morals clauses have long been held valid and enforceable.") (citing 19 Williston on Contracts 45:45; Rest. 2d Agency § 380); *Galaviz v. Post-Newsweek Stations San Antonio, Inc.*, 380 Fed. App'x. 457, 460 (5th Cir. 2010) (finding defendant was permitted to terminate plaintiff employee for violation of a morals clause in plaintiff's employment contract which prohibited her from "becom[ing] involved in any situation . . . which brings Employee into public disrepute, contempt, or scandal….").  In fact, enforcement of "morals clauses" is also entirely consistent with United States Trademark law, which imposes upon trademark owners an affirmative obligation to control the quality of the goods it sells under specific trademarks.  *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir. 1971), *cert. denied*, 405 U.S. 955 (1972) ("The licensor owes an affirmative duty to the public to assure that

12

in the hands of his licensee the trademark continues to represent that which it purports to represent.").[3]  Thus, Hanesbrands' termination of Mr. Mendenhall was consistent with both its contractual rights under the Talent Agreement, as well as the guarantee of quality and image Hanesbrands owes to its loyal consumers in association with the wholesome image of the CHAMPION® brand.

Nor does Plaintiff dispute that he posted the 9/11 Tweets on May 2nd.  (Complaint ¶ 35).  Plaintiff admits that, after posting the 9/11 Tweets, he received "negative reaction" and comments "opposed" to his views.  (Complaint ¶ 36).  Plaintiff also admits that his statements were "controversial" and acknowledged that, while not his intent, they had "stir[red] up controversy."  (*Id.*)  Plaintiff  apparently received enough criticism or ridicule in the two days that followed his posting of the 9/11 Tweets that he felt the need to post a public "clarification" to attempt to mollify anyone he had "unintentionally harmed" by his statements.  (*Id.*; Answer, Ex. 5).

Plaintiff's Complaint does not even attempt to allege that 9/11 Tweets did not meet either of the standards set forth in the revised Paragraph 17(a) – i.e., that they either tended to bring him into public disrepute, contempt, scandal or ridicule, OR that they tended to shock, insult, or offend a majority of the consuming public.  Indeed, it would be

---

[3] Moreover, a trademark owner's failure to control quality constitutes a fraud on the consuming public causing the trademark to become abandoned.  See, e.g. *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 516 (9th Cir. 2010) (stating that "fail[ure] to exercise adequate quality control" is "inherently deceptive and constitutes abandonment of any rights to the trademark") (citations omitted); *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir. 1977) ("If a trademark owner allows licensees to depart from its quality standards, the public will be misled, and the trademark will cease to have utility as an informational device. A trademark owner who allows this to occur loses its right to use the mark.").

hard to refute this fact given that Plaintiff himself felt the need to delete at least two of the admittedly "controversial" tweets AND to make a public apology to those whom his statements offended. (Answer, Exs. 3, 4 and 5). Perhaps that is why, when Hanesbrands informed Plaintiff of its conclusion that the 9/11 Tweets met the standard set forth in paragraph 17(a), Plaintiff did not dispute it. Instead, in response, Plaintiff merely sent a letter disputing the amount due and owing to him under the Agreement. (Complaint, Ex. G).

What Plaintiff appears to allege in his Complaint is only that Hanesbrands can't terminate the Talent Agreement based on Plaintiff's statements about Bin Laden and September 11th, because Hanesbrands had not previously warned Plaintiff (or terminated the Talent Agreement) when Plaintiff had posted other allegedly controversial comments to his Twitter feed in March and April of 2011. (*See* Complaint ¶¶ 21-28, 43) However, that argument is a red herring.

Even assuming the Extension Agreement had been in operation at the time Plaintiff made the other allegedly controversial statements on Twitter in March and April of 2011 (as alleged in ¶¶ 21, 23, 26 and 28 of the Complaint), Hanesbrands was under no obligation to warn Plaintiff that such statements may constitute the basis for termination of the Agreement. Nowhere in Paragraph 17(a) does it state that Hanesbrands was required to provide Plaintiff with any warning, or to notify Plaintiff that Hanesbrands "disagreed" with his comments or that his actions "were inconsistent with the values of the CHAMPION® brand or his obligations under the Talent Agreement," prior to

14

terminating the Talent Agreement under Paragraph 17(a). To the contrary, the clause plainly states that Hanesbrands "shall have the right to immediately terminate" the Talent Agreement upon Plaintiff becoming involved in one of the specified situations or occurrences.

Nor was Hanesbrands *required* to terminate Plaintiff based on the March and April statements, or the May 1st statements, even if such statements, in Hanesbrands' discretion, constituted an "Act" under Paragraph 17(a). Although Hanesbrands' *right* to terminate the Agreement is immediate upon the occurrence of a Paragraph 17(a) "Act", under subsection (d) of that paragraph, Hanesbrands has up to 120 days after the Act to notify Plaintiff of its intent to terminate the Agreement; subsection (d) also makes clear that Hanesbrands has the discretion to decline to exercise the termination right entirely. (Complaint, Ex. A at 7).

In sum, the parties are not in dispute as to the terms of the Talent Agreement. Nor are they in dispute as to the contents of the statements that formed the basis of Hanesbrands' termination of the Agreement pursuant to Paragraph 17(a). Since, pursuant to the terms of the Talent Agreement, Hanesbrands undisputedly retained the sole discretion with regard to decisions concerning Paragraph 17(a), Hanesbrands is entitled to judgment on pleadings, dismissing Plaintiff's breach of contract claim insofar as it is based on allegations that Hanesbrands wrongfully terminated the Talent Agreement. It is a matter of both fact and simple common sense that the morals clause was implicated when Mr. Mendenhall made his controversial statements about Osama bin Laden and

questioned whether the United States government was behind the 9/11 attacks on the

World Trade Center. Mr. Mendenhall is entitled to his opinions. But, Hanesbrands, in

turn, was contractually entitled to terminate its contractual relationship with Mr.

Mendenhall once it determined that his controversial and offensive statements tended to

bring him into public disrepute, contempt, scandal or ridicule, or tended to shock, insult,

or offend the majority of the consuming public. (Complaint, Ex. B at 4).

## III.  TERMINATION OF THE AGREEMENT UNDER PARAGRAPH 17(A) RELIEVED HANESBRANDS OF ANY FURTHER PAYMENT OBLIGATIONS

As demonstrated above, Hanesbrands had the absolute right under Paragraph 17(a)

to terminate Plaintiff for the statements he made about Osama Bin Laden and the events

of September 11, 2001. Accordingly, under subsection (d) of Paragraph 17, Hanesbrands

was relieved of its payment obligations as of May 13, 2011, the effective date of the

termination. Paragraph 17(d) provides:

> In the event of termination pursuant to this Paragraph, HBI
> shall be immediately discharged from any payment
> obligations hereunder and/or be entitled to a pro rata refund
> from Mendenhall to be calculated pursuant to the formula set
> forth in Paragraph 19(c).

(Complaint, Ex. A at 7).

In Hanesbrands's May 11th Letter to Plaintiff (Complaint, Ex. F), Hanesbrands

states its intent to pay Plaintiff $7,836.00 for services rendered under the Agreement for

the period of May 1st through May 13th. Hanesbrands further states that "[w]e arrived at

this amount by dividing his annual fee of $220,000.00 by 365 days and multiplying that

16

number by thirteen (13)." (*Id*. at 2)  Thus, as required by Paragraph 17(d), Hanesbrands calculated the amount due to Plaintiff using the formula set forth in Paragraph 19(c) of the Talent Agreement.  (Complaint, Ex. A at 9).  Plaintiff admits that he received a payment of $7,836.00 from Hanesbrands.  (Complaint, Ex. G).

Accordingly, there is no dispute that Hanesbrands terminated Plaintiff under Paragraph 17(a), or that Hanesbrands paid Plaintiff the amount owed to him, as calculated by Paragraph 19(c).  Thus, under the plain terms of the contract, Hanesbrands has paid all amounts due and owing to Plaintiff under the contract, and therefore has not breached its Article 19(b) obligations.

## CONCLUSION

For all of the foregoing reasons, Hanesbrands respectfully requests that the Court grant its motion for judgment on the pleadings in favor of Hanesbrands or, in the alternative, to dismiss Plaintiff's Complaint, with prejudice, for failure to state a claim, and to award such other and further relief to Hanesbrands as the Court deems just and proper.  In view of Hanesbrands' clear right to terminate the Talent Agreement as a result of Mr. Mendenhall's ill-advised and unfortunate comments about the death of Osama bin Laden and the United States Government's purported role in ending thousands of human lives on 9/11, such a ruling is fully warranted at this early stage and in fact would comport with the intent of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 1 (the Rules of Civil Procedure "should be construed and administered to secure the just,

speedy, and inexpensive determination of every action and proceeding.")  (emphasis

added).

Dated: August 30, 2011


                         _/s/ John F. Morrow, Jr._____

                         John F. Morrow, Jr. (N.C. State Bar No. 23382)
                         Brent F. Powell (N.C. State Bar No. 41938)
                         Womble Carlyle Sandridge & Rice, PLLC
                         One West Fourth Street
                         Winston-Salem, NC  27101
                         United States of America
                         Telephone: (336) 721-3584
                         Facsimile: (336) 733-8429
                         jmorrow@wcsr.com
                         brpowell@wcsr.com

                         Brendan J. O'Rourke
                         Victoria L. Loughery
                         PROSKAUER ROSE LLP
                         11 Times Square
                         New York, New York 10036-8299
                         Telephone:   (212) 969-3000
                         Facsimile:    (212) 969-2900
                         borourke@proskauer.com
                         vloughery@proskauer.com


                         *Attorneys for Defendant Hanesbrands, Inc.*

## CERTIFICATE OF SERVICE

This to certify that on this the 30th day of August, 2011, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

DAVID WILLIAM SAR:  dsar@brookspierce.com

ERIC M. DAVID:  edavid@brookspierce.com

RICHARD H. TILGHMAN:  rhtilghman@uhlaw.com

STEVEN J. THOMPSON:  sjthompson@uhlaw.com

/s/ John F. Morrow, Jr.
John F. Morrow, Jr. (N.C. State Bar No. 23382)