IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

RASHARD MENDENHALL,            )
                               )
        Plaintiff,             )
                               )
    v.                         )     1:11CV570
                               )
HANESBRANDS, INC.,             )
                               )
        Defendant.             )

ORDER AND MEMORANDUM OPINION

BEATY, Chief Judge.

This matter is currently before the Court on Defendant Hanesbrands, Inc.'s ("Hanesbrands," "HBI" or "Defendant") Motion for Judgment on the Pleadings [Doc. #11] which seeks judgment on Plaintiff Rashard Mendenhall's ("Mr. Mendenhall" or "Plaintiff") claim for breach of contract. For the reasons set forth below, Defendant's Motion for Judgment on the Pleadings [Doc. #11] will be DENIED.

I.   Factual Background

Taking as true the facts alleged in the Complaint, the Court will recount the relevant background facts surrounding Plaintiff's claim against Defendant. Mr. Mendenhall is a professional athlete in the National Football League ("NFL") and is employed as a running back by the Pittsburgh Steelers. (Complaint ¶ 1). In May 2008, Mr. Mendenhall and Hanesbrands, a Maryland corporation with its principal place of business located in Winston-Salem, North Carolina, entered into a Talent Agreement (the "Talent Agreement"). (Complaint, Ex. A at 1). Under the terms of the Talent Agreement, Hanesbrands would use the services of

Mr. Mendenhall to advertise and promote Hanesbrands' products sold under the Champion trademark. (Complaint, Ex. A at 1). The Talent Agreement was for a three-year term, beginning on May 1, 2008, and expiring on April 30, 2011. (Complaint, Ex. A at 1).

In August 2010, the parties executed an "Amendment and Extension of Hanesbrands Inc. Talent Agreement" (the "Extension Agreement"), which extended the term of the Talent Agreement for an additional four years, until April 30, 2015. (Complaint, Ex. B at 1). In addition to extending the term of the Talent Agreement, the Extension Agreement modified Section 17(a) of the Talent Agreement. (Complaint, Ex B at 4). Under the original terms of Section 17(a) as stated in the Talent Agreement:

> If Mendenhall is arrested for and charged with, or indicted for or convicted of any felony or crime involving moral turpitude, then HBI shall have the right to immediately terminate this Agreement.

(Complaint, Ex. A at 7). Pursuant to Section 3(a) of the Extension Agreement, the terms of Section 17(a) were modified to state the following:

> If Mendenhall commits or is arrested for any crime or becomes involved in any situation or occurrence (collectively, the "Act") tending to bring Mendenhall into public disrepute, contempt, scandal, or ridicule, or tending to shock, insult or offend the majority of the consuming public or any protected class or group thereof, then we shall have the right to immediately terminate this Agreement. HBI's decision on all matters arising under this Section 17(a) shall be conclusive.

(Complaint, Ex. B at 4).

Beginning in January 2011, Mr. Mendenhall "used the Twitter social media platform ("Twitter") to be himself, to express his opinions and [to] foster debate on controversial and non-controversial issues." (Complaint ¶¶ 3, 18). On his Twitter profile, Mr. Mendenhall describes himself as a "Conversationalist and Professional Athlete." (Complaint ¶ 19;

2

Answer ¶ 19). Between March 15, 2011, and May 1, 2011, Plaintiff used his Twitter account to candidly express his views about Islam, women, parenting and relationships, and made comments in which Plaintiff compared the NFL to the slave trade. (Complaint ¶¶ 20-32). Plaintiff alleges that in response to these tweets, "Hanesbrands at no time suggested that it disagreed with Mr. Mendenhall's comments or that his tweets were in any way inconsistent with the values of the Champion brand or his obligations under the Talent Agreement, or that because of his tweets, Hanesbrands believed Mr. Mendenhall could no longer continue to effectively communicate on behalf of and represent Champion with consumers." (Complaint ¶¶ 25, 27, 29, 31).

On May 2, 2011, Plaintiff issued the following tweets regarding Osama bin Laden, whose death had been announced by President Obama on May 1, 2011:

> What kind of person celebrates death? It's amazing how people can HATE a man they never even heard speak. We've only heard one side . . .
>
> I believe in God. I believe we're ALL his children. And I believe HE is the ONE and ONLY judge.
>
> Those who judge others, will also be judged themselves.
>
> For those of you who said we want to see Bin Laden burn in hell and piss on his ashes, I ask how would God feel about your heart?
>
> There is not an ignorant bone in my body. I just encourage you to #think
>
> @dkller23 We'll never know what really happened. I just have a hard time believing a plane could take a skyscraper down demolition style.

(Complaint ¶ 35).

In response to the May 2, 2011 tweets noted above, Plaintiff received some comments

3

in support and some comments opposed to his views. (Complaint ¶ 36). On May 4, 2011, "[i]n response to some negative reaction" to the May 2, 2011 tweets, Mr. Mendenhall issued the following explanation:

> I appreciate those of you who have decided to read this letter and attain a greater understanding of my recent twitter posts. I see how they have gotten misconstrued, and wanted to use this outlet as a way to clear up all things that do not truthfully represent myself, what I stand for personally, and any organization that I am a part of.
>
> First, I want people to understand that I am not in support of Bin Laden, or against the USA. I understand how devastating 9/11 was to this country and to the people whose families were affected. Not just in the US, but families all over the world who had relatives in the World Trade Centers. My heart goes out to the troops who fight for our freedoms everyday, not being certain if they will have the opportunity to return home, and the families who watch their loved ones bravely go off to war. Last year, I was grateful enough to have the opportunity to travel over seas and participate in a football camp put on for the children of US troops stationed in Germany. It was a special experience. These events have had a significant impact in my life.
>
> "What kind of person celebrates death? It's amazing how people can HATE a man they have never even heard speak. We've only heard one side…"
>
> This controversial statement was something I said in response to the amount of joy I saw in the event of a murder. I don't believe that this is an issue of politics or American pride; but one of religion, morality, and human ethics. In the bible, Ezekiel 33:11 states, "Say to them, 'As surely as I live, declares the Sovereign LORD, I take no pleasure in the death of the wicked, but rather that they turn from their ways and live. Turn! Turn from your evil ways…" I wasn't questioning Bin Laden's evil acts. I believe that he will have to face God for what he has done. I was reflecting on our own hypocrisy. During 9/11 we watched in horror as parts of the world celebrated death on our soil. Earlier this week, parts of the world watched us in horror celebrating a man's death.
>
> Nothing I said was meant to stir up controversy. It was my way to generate conversation. In looking at my timeline in its entirety, everything that I've said is with the intent of expressing a wide array of ideas and generating open and honest discussions, something I believe we as American citizens should be able to do. Most opinions will not be fully agreed upon and are not meant to be. However, I believe every opinion should be respected or at least given some thought. I apologize for the timing as such a sensitive matter, but it was not meant to do harm. I apologize to anyone I unintentionally harmed with anything that I said, or any hurtful interpretation that was

4

made and put in my name.

It was only meant to encourage everyone reading it to think.

(Complaint ¶ 36).

In a letter dated May 5, 2011, and addressed to Rob Lefko, one of Mr. Mendenhall's representatives at Priority Sports and Entertainment, Hanesbrands' Associate General Counsel, L. Lynette Fuller-Andrews, indicated that it was Hanesbrands' intent to terminate the Talent Agreement effective Friday, May 13, 2011, pursuant to Paragraph 17(a) of the Agreement. (Complaint, Ex. C). On May 6, 2011, Hanesbrands issued a public statement to ESPN, stating the following:

> Champion is a strong supporter of the government's efforts to fight terrorism and is very appreciative of the dedication and commitment of the U.S. Armed Forces. Earlier this week, Rashard Mendenhall, who endorses Champion products, expressed personal comments and opinions regarding Osama bin Laden and the September 11 terrorist attacks that were inconsistent with the values of the Champion brand and with which we strongly disagreed. In light of these comments, Champion was obligated to conduct a business assessment to determine whether Mr. Mendenhall could continue to effectively communicate on behalf of and represent Champion with consumers.
>
> While we respect Mr. Mendenhall's right to express sincere thoughts regarding potentially controversial topics, we no longer believe that Mr. Mendenhall can appropriately represent Champion and we have notified Mr. Mendenhall that we are ending our business relationship. Champion has appreciated its association with Mr. Mendenhall during his early professional football career and found him to be a dedicated and conscientious young athlete. We sincerely wish him all the best.

(Complaint, Ex. D; Answer ¶ 39).

In a series of correspondence between Mr. Mendenhall's representative at Priority Sports and Entertainment and Hanesbrands' Associate General Counsel, Mr. Mendenhall contended that Hanesbrands had no legal basis for terminating the Talent Agreement and Extension. In

contrast, Hanesbrands contended that Mr. Mendenhall's May 2, 2011 tweets regarding the death of Osama bin Laden and the events of September 11, 2001, met the standard set forth in Section 17(a) of the Talent Agreement and Extension and therefore Hanesbrands was within its right to terminate the Agreement. (Complaint, Exs. E and F).

On July 18, 2011, Plaintiff filed this civil action, alleging that Hanesbrands breached the Talent Agreement and Extension "[b]y its actions purporting to terminate the Talent Agreement and Extension under Section 17(a), and by its failure and refusal to pay amounts due Mr. Mendenhall." (Complaint ¶ 48). Specifically, Plaintiff alleges that the "unilateral action taken by Hanesbrands is unreasonable, violates the express terms of the Talent Agreement and Extension, is contrary to the course of dealing between the parties with regard to Mr. Mendenhall's use of Twitter to freely express opinions on controversial and non-controversial subjects, violates the covenant of good faith and fair dealing implied in every contract, and constitutes a breach of the Talent Agreement." (Complaint ¶ 4).

Defendant, in its Motion for Judgment on the Pleadings, contends that it was within its rights under the express terms of Section 17(a) to terminate the Talent Agreement and Extension with Mr. Mendenhall pursuant to Section 17(a) of the Agreement. Hanesbrands argues that its decision on all matters arising under Section 17(a) are to be deemed conclusive pursuant to the Section's express terms. It is for these reasons that Hanesbrands moves for Judgment on the Pleadings [Doc. #11], asserting that "[b]ecause the undisputed terms of the Talent Agreement vested Hanesbrands with the conclusive authority to terminate its contractual relationship with Mr. Mendenhall once it determined that his controversial and offensive

statements tended to bring him into public disrepute, contempt, scandal or ridicule, or tended to shock, insult, or offend the majority of the consuming public, Mr. Mendenhall's breach of contract claim fails as a matter of law." (Def.'s Mot. for J. on the Pleadings [Doc. #11] at 2). In the alternative, Defendant requests that the Court dismiss Plaintiff's Complaint for failure to state a claim. (Id. at 3). The Court notes, however, that it will not treat Defendant's Motion as a Motion to Dismiss because procedurally, a Motion to Dismiss would not be appropriate because Defendant has already filed its Answer.[1] See Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999) (finding that, as a matter of motions practice, after Defendant has filed an Answer, Defendant's Motion to Dismiss should be viewed as a Motion for Judgment on the Pleadings, which raises the defense of failure to state a claim upon which relief can be granted).

In considering Defendant's Motion for Judgment on the Pleadings [Doc. #11], the Court notes, that in an action based upon diversity of citizenship, as here, the district court must "apply the substantive law of the state in which it sits, including the state's choice of law rules." Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., 386 F.3d 581, 599-600 (4th Cir. 2004) (citing Erie R.R. Co v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188; Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496, 61 S. Ct. 1020, 1021, 85 L.Ed. 1477 (1941) ("We are of opinion that the prohibition declared in Erie Railroad . . . against such independent determinations by the federal courts extends to the field of conflict of laws.")). Under North Carolina choice of law rules, "the interpretation of a contract is governed by the law of the place

---

[1] The Court notes that even if the alternative Motion to Dismiss were before the Court, the Court would reach the same result based upon a finding that, at this stage of the proceedings, Plaintiff has alleged a plausible claim of breach of contract based upon his allegation of unreasonable conduct by Hanesbrands.

7

where the contract was made." Bueltel v. Lumber Mut. Ins. Co., 134 N.C. App. 626, 631, 518 S.E.2d 205, 209 (1999) (citing Tanglewood Land Co., Inc. v. Byrd, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980)). However, "where parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect." Id. (citing Tanglewood, 299 N.C. at 262, 261 S.E.2d at 656); see Volvo Constr. Equip. N. Am., 386 F.3d at 600-01 (finding that North Carolina typically gives effect to choice of law provisions). In the present case, Section 23 of the Talent Agreement provides that:

> This Agreement shall be governed by and construed in accordance with the laws of the State of New York and the Federal laws of the United States applicable therein, pertaining to contracts made and performed entirely within the State of North Carolina, without regard to any conflict of laws principles in any jurisdiction.

(Complaint, Ex. A at 10). Therefore, the Court will apply New York law in construing the requirements of the Talent Agreement between Hanesbrands and Mr. Mendenhall.

II.     Standard of Review

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed–but early enough not to delay trial–a party may move for judgment on the pleadings." A motion for judgment of the pleadings pursuant to Rule 12(c) is analyzed under the same standard as a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss. Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 405-06 (4th Cir. 2002); Edwards, 178 F.3d at 243. Accordingly, the Court will assume that the facts alleged in the Complaint are true and will draw all reasonable inferences in Plaintiff's favor as the nonmoving party. Burbach, 278 F.3d at 405-06. However, while the Court "take[s] the facts in the light most favorable to the [P]laintiff, . . .

8

[the Court] need not accept the legal conclusions drawn from the facts," and "need not accept as true unwarranted inferences, unreasonable conclusions or arguments." Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (quoting Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000)). Additionally, the Complaint must allege "enough facts to state a claim to relief that is plausible on its face." Id. (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)). A pleading that "offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do" and a complaint will not "suffice if it tenders naked assertions devoid of further factual enhancements." Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (internal quotation marks omitted) (citing Twombly, 550 U.S. at 555, 127 S. Ct. at 1965).

However, "[u]nlike on a Rule 12(b)(6) motion . . . on a Rule 12(c) motion the [C]ourt may consider the Answer as well." Alexander v. City of Greensboro, No. 1:09-CV-293, 2011 WL 3360644, at *2 (M.D.N.C. August 3, 2011); Rinaldi v. CCX, Inc., No. 3:05-cv-108, 2008 WL 2622971, at *2 n.3 (W.D.N.C. July 2, 2008) (noting that "the Court considers the Answer as well as the Complaint"); Bradley v. Ramsey, 329 F. Supp. 2d 617, 622 (W.D.N.C. 2004) (finding that as it relates to Rule 12(b)(6), the key difference under Rule 12(c) is "the [C]ourt is to consider the [A]nswer as well as the [C]omplaint"). The "factual allegations in the [A]nswer are taken as true to the extent they have not been denied or do not conflict with the [C]omplaint." Farmer v. Wilson Hous. Auth., 393 F. Supp. 2d 384, 386 (E.D.N.C. 2004) (internal quotation marks omitted) (citing Pledger v. North Carolina Dep't of Health & Human Servs., 7 F. Supp. 2d 705, 707 (E.D.N.C. 1998)); Jadoff v. Gleason, 140 F.R.D. 330, 331 (M.D.N.C. 1991). For the

"purposes of this motion Defendant cannot rely on allegations of fact contained only in the [A]nswer, including affirmative defenses, which contradict [the] [C]omplaint" because Plaintiff was "not required to reply to Defendant's [A]nswer, and all allegations in the [A]nswer are deemed denied." Jadoff 140 F.R.D. at 332; Lefkoe v. Jos. A. Bank Clothiers, No. WMN-06-1892, 2008 WL 7275126, at *3 (D.Md. May 13, 2008); see Fed. R. Civ. P. 8(b)(6) ("If a responsive pleading is not required, an allegation is considered denied or avoided."). In "determining a motion for judgment on the pleadings, the [C]ourt may consider documents incorporated by reference in the pleadings." Farmer, 393 F. Supp. 2d at 386 (internal quotation marks omitted) (citing Parks v. Alteon, Inc., 161 F. Supp. 2d 645, 649 n.1 (M.D.N.C. 2001)). However, documents attached to the Answer are part of the pleadings for Rule 12(c) purposes, and may be considered without converting a motion for judgment on the pleadings into a motion for summary judgment, only if the documents are central to the Plaintiff's claim and the authenticity is not challenged. Horsley v. Feldt, 304 F.3d 1125, 1134-35 (11th Cir. 2002) (finding that the "incorporation by reference doctrine . . . under which a document attached to a motion to dismiss may be considered by the court without converting the motion into one for summary judgment only if the attachment is: (1) central to the plaintiff's claim; and (2) undisputed" applies "for Rule 12(c) purposes to documents attached to answers")); Lefkoe, 2008 WL 7275126, at *4; Farmer, 393 F. Supp. 2d at 386. In addition, judgment on the pleadings is only appropriate when, taking all of the non-moving party's factual allegations as true, no genuine issues of material fact remain and the case can be determined as a matter of law. Smith v. McDonald, 562 F. Supp. 829, 842 (M.D.N.C. 1983), aff'd, 737 F.2d 427 (4th Cir. 1984), aff'd, 472 U.S. 479

(1985); Med-Trans Corp. v. Benton, 581 F. Supp. 2d 721, 728 (E.D.N.C. 2008).

III.     Analysis

Under New York law, in order to state a claim for breach of contract, the Complaint must allege: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach. RCN Telecom Servs., Inc. v. 202 Centre St. Realty LLC, 156 Fed. Appx. 349, 350-51 (2d Cir. 2005) (citing Marks v. New York Univ., 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999)). With regard to the first element, the parties in the present case do not dispute the existence of a valid and enforceable contract. As to the second element, that is, whether Plaintiff performed his duties under the Talent Agreement and Extension, the Court finds that Plaintiff has alleged enough facts to sufficiently plead this element, in that, Plaintiff has alleged that he was paid in full for the initial term of the contract, that the term of the contract was extended, in part, because of his efforts to promote the Champion brand, and that he remained available to perform his duties under the Talent Agreement and Extension during the extension term even after Hanesbrands purported to terminate the Talent Agreement and Extension, as alleged in the Complaint. (Complaint ¶¶ 2, 3, 13).

As to the third element, that is, as to Plaintiff's contention of non-performance by Defendant, Plaintiff has alleged that "by [Hanesbrands'] actions purporting to terminate the Talent Agreement and Extension under Section 17(a), and by its failure and refusal to pay amounts due Mr. Mendenhall, Defendant Hanesbrands is in breach of the Talent Agreement and Extension." (Complaint ¶ 48). As previously noted, pursuant to Section 17(a) of the Talent

11

Agreement and Extension, Hanesbrands had the right to immediately terminate the Agreement, "[i]f Mendenhall commits or is arrested for any crime or becomes involved in any situation or occurrence tending to bring Mendenhall into public disrepute, contempt, scandal or ridicule, or tending to shock, insult or offend the majority of the consuming public or any protected class or group thereof." (Complaint, Ex. B at 4). Plaintiff does not allege that the morals clause in Section 17(a) is unenforceable as a general matter.[2] Rather, Plaintiff alleges that Hanesbrands' action in purporting to terminate the Talent Agreement and Extension pursuant to Section 17(a), based on Plaintiff's May 2, 2011 tweets regarding Osama bin Laden, was "unreasonable, violates the express terms of the Talent Agreement and Extension, is contrary to the course of dealing between the parties with regard to Mr. Mendenhall's use of Twitter to freely express opinions on controversial and non-controversial subjects, [and] violates the covenant of good faith and fair dealing implied in every contract." (Complaint ¶ 4).

As it relates to the reasonableness of Hanesbrands' action, implied in all contracts governed by New York law "is a covenant of good faith and fair dealing in the course of contract performance," which requires parties exercising discretion under the contract "not to act arbitrarily or irrationally in exercising that discretion." Dalton v. Educ. Testing Serv., 87 N.Y. 2d 384, 389, 639 N.Y.S. 2d 977, 663 N.E. 2d 289 (1995) (finding that "within the implied obligation of each promisor to exercise good faith are any promises which a reasonable person in the position of the promisee would be justified in understanding were included" and

---

[2] In an unpublished decision, Nader v. ABC Television, Inc., the Second Circuit found that "[m]orals clauses have long been held valid and enforceable . . . [and] [t]here is no indication that New York departs from this generally applicable law on this point." Nader v. ABC Television, Inc., 150 Fed. Appx. 54, 56 (2d Cir. 2005).

12

that where the contract contemplates the exercise of discretion, the covenant of good faith and fair dealing "includes a promise not to act arbitrarily or irrationally in exercising that discretion"); Fishoff v. Coty Inc., 634 F.3d 647, 653 (2d Cir. 2011); Sveaas v. Christie's Inc., 452 Fed. Appx. 63, 66 (2d Cir. 2011). Courts have "equated the covenant of good faith and fair dealing with an obligation to exercise . . . discretion reasonably and with proper motive, . . . not . . . arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." Fishoff, 634 F.3d at 653 (quoting In re Kaplan, 143 F.3d 807, 819 (3d Cir. 1998) (internal quotation marks omitted)). The "duty of good faith and fair dealing, however, is not without limits, and no obligation can be implied that would be inconsistent with other terms of the contractual relationship." Dalton, 87 N.Y. at 389, 639 N.Y.S. 2d at 979-80, 663 N.E. 2d 289. A "breach of the duty of good faith and fair dealing is considered a breach of contract." Fishoff, 634 F.3d at 653.

In the present case, the Court finds that to the extent that the Talent Agreement and Extension provides Hanesbrands with discretionary termination rights under Section 17(a), that discretion is subject to the implied covenant of good faith and fair dealing. As such, Hanesbrands' exercise of any such discretion, under the implied covenant of good faith and fair dealing, would include a promise on Hanesbrands' part not to act arbitrarily, irrationally or unreasonably in exercising that discretion. See Dalton, 87 N.Y. at 389, 639 N.Y.S. 2d at 979-80, 663 N.E. 2d 289; Fishoff, 634 F.3d at 653.

In alleging that Hanesbrands acted unreasonably, Plaintiff's Complaint includes factual allegations that Hanesbrands, in a letter dated May 5, 2011, purported to terminate the Talent

13

Agreement and Extension pursuant to Section 17(a) of the Agreement, while at the same time issuing a public statement to ESPN on May 6, 2011, which indicated that Hanesbrands ended its business relationship with Mr. Mendenhall for another reason, that being because it strongly disagreed with Mr. Mendenhall's comments. Since Section 17(a) is applicable only to the extent that Mr. Mendenhall became involved in an act that tended to "bring [him] into public disrepute, contempt, scandal or ridicule," or tended "to shock, insult or offend the majority of the consuming public or any protected class or group thereof," mere disagreement with Mr. Mendenhall's comments would not have triggered Hanesbrands' termination rights under Section 17(a). Therefore, from Plaintiff's factual allegations, the Court can reasonably infer that Defendant's actions in purporting to terminate the Talent Agreement and Extension pursuant to Section 17(a), may have been unreasonable, in light of the covenant of good faith and fair dealing, if such action was based on mere disagreement with Plaintiff's statements rather than on the applicability of Section 17(a)'s standard, as alleged by Plaintiff.

However, Defendant, in its Memorandum in Support of its Motion for Judgment on the Pleadings, contends that "Defendant had the right to terminate the contract as a result of the backlash caused by [Plaintiff's] outrageous statements." (Def's Mem. in Supp. of Mot. for J. on the Pleadings [Doc. #12] at 2). Defendant also contends that there was well-documented negative public reaction to Plaintiff's May 2, 2011 statements and that "Plaintiff's statements caused an almost instantaneous public uproar." (Id. at 7). In support of its contention, Defendant attached to its Answer select news reports relating to Mr. Mendenhall's May 2, 2011 tweets. The Court notes that for the purposes of a motion for judgment on the pleadings,

documents attached to the Answer are part of the pleadings and may be considered by the Court without converting the motion to one for summary judgment only if the documents are central to Plaintiff's claim and the authenticity is not challenged. Horsley, 304 F.3d at 1134-35; Lefkoe, 2008 WL 7275126, at *4; Farmer, 393 F. Supp. 2d at 386. In this case, Plaintiff challenges the authenticity of the news reports that were attached to Defendant's Answer. (Pl.'s Mem. in Opp'n to Def.'s Mot. for J. on the Pleadings [Doc. #16] at 8-10). Therefore, the news reports that are attached to Defendant's Answer are not properly before the Court for the purposes of a motion for judgment on the pleadings, and the Court will not convert Defendant's Motion to one for summary judgment. As such, the Court finds that it is not appropriate at this stage of the proceedings to consider the news reports attached to Defendant's Answer.

Nevertheless, Defendant contends that even without reference to the news reports, the undisputed facts support dismissal of this action. Specifically, Defendant contends that Plaintiff admits in the Complaint that: 1) after posting the 9/11 Tweets, he received 'negative reaction' and comments 'opposed' to his views; 2) his statements were 'controversial'; and 3) Plaintiff "apparently received enough criticism or ridicule in the two days that followed his posting of the 9/11 Tweets that he felt the need to post a public 'clarification' to attempt to mollify anyone he had 'unintentionally harmed' by his statements." (Def's Mem. in Supp. of Mot. for J. on the Pleadings [Doc. #12] at 13; Def's Reply Mem. in Further Supp. of Mot. for J. on the Pleadings [Doc. #17] at 3).

However, taking Plaintiff's allegations as true, and drawing all reasonable inferences in Plaintiff's favor, the Court notes that although Plaintiff alleges in his Complaint that in response

15

to "some negative reaction," he issued an explanation of his May 2, 2011 tweets, Plaintiff at no time in his Complaint made a blanket admission as to the nature of the public's response to his May 2, 2011 tweets as being consistent with the characterization that Defendant suggests is covered by Section 17(a) of the Agreement. In fact, Plaintiff alleged that he received supportive tweets from members of the public in response to his May 2, 2011 comments regarding the death of Osama bin Laden. Among the positive responses alleged by Plaintiff were the following tweets:

> @R_Mendenhall At first I was upset about ur tweets but like ur goal it got me thinkin mad respect for u man Love a man of God
>
> @R_Mendenhall // appreciate your thought provoking tweets. it's time people stop living a selfishly blind life.
>
> @R_Mendenhall I've never been a Steelers fan, but I have more respect for you than any other professional athlete I can think of.
>
> @R_Mendenhall your mental state should be the prototype for not just athletes but humans in general.

(Complaint ¶ 37).

Therefore, the Court finds that a dispute of fact exists between the parties as to the nature of the public's response to Plaintiff's May 2, 2011 tweets. Furthermore, based on Plaintiff's allegations, the Court finds that, at this early stage of the proceedings, Plaintiff has stated at the very least a plausible claim for breach of contract based on the implied covenant of good faith and fair dealing. To find otherwise would require the Court to impermissibly draw

16

inferences in Defendant's favor. To resolve this matter, a factual determination as to the nature of the public's response is necessary in order to assess whether the public's response to Plaintiff's May 2, 2011 tweets could reasonably be characterized in a manner that would trigger Hanesbrands' right to terminate the Agreement under Section 17(a)'s standard, which applied only to acts that tended to "bring [Mr. Mendenhall] into public disrepute, contempt, scandal, or ridicule," or tended "to shock, insult, or offend the majority of the consuming public." When, as in this case, there exists a material dispute of fact, such a determination goes beyond the scope of a motion for judgment on the pleadings, and therefore judgment as a matter of law is not appropriate at this stage of the proceedings. See Smith, 562 F. Supp. at 842, aff'd, 737 F.2d 427 (4th Cir. 1984), aff'd, 472 U.S. 479 (1985); Med-Trans Corp., 581 F. Supp. 2d at 728. Therefore, Defendant's Motion for Judgment on the Pleadings will be DENIED.

IV.     Conclusion

For the reasons set forth herein, the Court finds that a judgment on the pleadings would be premature at this time and is not warranted given the allegations of Plaintiff's Complaint. IT IS THEREFORE ORDERED that Defendant's Motion for Judgment on the Pleadings [Doc. #11] is DENIED.

This, the 12th day of April, 2012.

_____
United States District Judge