

Analysis
As of: Oct 09, 2012

**TEAM GORDON, INC., Plaintiff, vs. FRUIT OF THE LOOM, INC., Defendant.**

**CASE NO. 3:06-cv-201-RJC**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA, CHARLOTTE DIVISION**

**2009 U.S. Dist. LEXIS 16917**

**February 19, 2009, Decided
February 19, 2009, Filed**

**SUBSEQUENT HISTORY:** Motions ruled upon by Team Gordon, Inc. v. Fruit of the Loom, Inc., 2010 U.S. Dist. LEXIS 14227 (W.D.N.C., Jan. 29, 2010)

**CORE TERMS:** team, sponsorship, summary judgment, season, counterclaim, sponsor, unfair, breach of contract, trade practices, material fact, genuine issue, deceptive, breached, apparel, qualify, servant, commercial bribery, termination, procure, t-shirt, refund, reasonable expectations, unfair advantage, unjust enrichment, bonus, manufacturer's, terminated, reasonableness, discount, notice

**COUNSEL:** [*1] For Team Gordon, Inc., Plaintiff: Rodney E. Alexander, W.C. Turner Herbert, LEAD ATTORNEYS, Mayer Brown LLP, Charlotte, NC.

For Fruit of the Loom, Inc., Defendant: D. Blaine Sanders, Jonathan C. Krisko, LEAD ATTORNEYS, Robinson, Bradshaw & Hinson, P. A., Charlotte, NC.

For Fruit of the Loom, Inc., Counter Claimant: Jonathan C. Krisko, LEAD ATTORNEY, Robinson, Bradshaw & Hinson, P. A., Charlotte, NC.

For Team Gordon, Inc., Counter Defendant: Rodney E. Alexander, LEAD ATTORNEY, W.C. Turner Herbert, Mayer Brown LLP, Charlotte, NC.

For Team Gordon, Inc., Counter Defendant: Rodney E. Alexander, W.C. Turner Herbert, LEAD ATTORNEYS, Mayer Brown LLP, Charlotte, NC.

**JUDGES:** Robert J. Conrad, Jr., Chief United States District Judge.

**OPINION BY:** Robert J. Conrad, Jr.

**OPINION**

**THIS MATTER** is before the Court on the parties' cross motions for summary judgment (Doc. Nos. 44, 45, 46, 55, 56, 70, 71, 74, 75, 76, 77, 82, 82, 84, & 85). For the following reasons, the Court will grant in part and deny in part Plaintiff's motions and will deny Defendant's motions.

**I. BACKGROUND**

Several months before Fruit of the Loom ("FOL") and Team Gordon entered into a sponsorship agreement, John Story (Team Gordon's NASCAR operations CEO) and Larry Camp [*2] (owner of Camp and Associates) developed a plan to target an apparel manufacturer as a source of sponsorship funds for a NASCAR team. Story, who then worked for Great White Shark Enterprises, believed that an apparel manufacturer could be drawn to sponsorship, particularly if it meant that the apparel

Page 1

manufacturer could sell apparel to distributors of NASCAR-related merchandise. Story, in fact, gave "birth to the idea of contacting Fruit of the Loom in the first place." (Doc. No. 46-7 at 2).

Camp had a relationship with Speedway Motorsports, Inc. ("SMI"), a company who controlled the distribution of a substantial volume of NASCAR related T-shirts and other apparel at race tracks bearing marks of NASCAR teams and drivers. Camp had information that SMI expected to expand its business and was looking to contract with an apparel manufacturer to be SMI's exclusive apparel provider. A condition of that relationship would be the apparel manufacturer's entry into the "NASCAR family" through sponsorship of a team in one of NASCAR's series. [1]

> 1 NASCAR is divided into several different series named for the corporate sponsors of each series. The most competitive series is the Sprint Cup Series, previously [*3] called the Nextel Cup Series and before that the Winston Cup Series. The second most competitive series is the Nationwide Series, previously called the Busch Series. For simplicity, the Court refers to these series as the Nextel Cup Series and the Busch Series, respectively, as the series' names applicable during the course of events at issue in this lawsuit.

Camp contacted FOL about participating in NASCAR as a sponsor and contacted SMI about FOL supplying apparel if FOL became a sponsor. FOL expressed interest in a relationship with SMI that would generate sales of 4 million or more T-shirts and serve as the "cornerstone or the foundation of [FOL] getting into NASCAR." (Doc. No. 46-10 at 3). FOL also believed that the demographics of NASCAR fans matched its own customers.

### A. Camp-Team Gordon Agreement

In August 2003, Camp and Team Gordon entered into an agreement (the "Camp-Team Gordon Agreement") whereby Camp would represent Team Gordon for the potential FOL sponsorship opportunity; if the team was awarded the sponsorship, Team Gordon would pay Camp 14%, 12%, and 10% of sponsorship fees received from the sponsor during the first, second, and third years (respectively) of the sponsorship. [*4] (Doc. No. 46-11). The Camp-Team Gordon Agreement

also included a provision that required Camp to "remain[] involved with the sponsor and/or team, thus influencing said sponsor's decision to negotiate an extension with the team" to earn any commission from Team Gordon after the third year of the sponsorship. (*Id.* at 4). The Camp-Team Gordon Agreement was confidential. Neither Team Gordon nor Camp could "reveal the terms of this Agreement to any third party" excluding Permitted Disclosures. (*Id.* at 5).

### B. FOL-Camp Agreement

About two weeks after Camp negotiated his commission arrangement with Team Gordon, FOL and Camp entered into a written agreement (the "Camp-FOL Agreement") whereby FOL agreed to pay Camp fees totaling $ 708,300 over a three-year term. (Doc. No. 46-12). In return, Camp was to advise FOL on the development of a motorsports marketing program, identify strategic marketing goals and objectives, and oversee public relations and media related to FOL's motorsports campaign. Camp's responsibilities included preparing sponsorship proposals, negotiating the terms of a sponsorship, and drafting sponsorship agreements on FOL's behalf.

### C. FOL-Team Gordon Sponsorship Agreement

In late [*5] September 2003, FOL and Camp met with Team Gordon and other teams in the Busch Series about FOL's possible sponsorship. Camp subsequently drafted a proposed sponsorship agreement and assisted in negotiating the agreement on FOL's behalf. Story negotiated the agreement on behalf of Team Gordon. FOL and Team Gordon entered into a written sponsorship agreement October 20, 2003 (the "Sponsorship Agreement") that identified Camp as FOL's agent. (Doc. No. 46-13). At the time FOL committed to sponsorship, neither Team Gordon nor Camp disclosed their personal relationship to FOL.

Under the Sponsorship Agreement, the sponsorship could last as long as three years. FOL would pay $ 3.5 million, $ 3.75 million, and $ 4 million (the maximum FOL had budgeted) for sponsorship in 2004, 2005, and 2006, respectively. Each year, FOL would "evaluate the sponsorship" and, "[i]f in the sole reasonable judgement of [FOL] the program fails to substantially meet reasonable expectations," FOL could decline to renew the Sponsorship Agreement for subsequent seasons. (*Id.* at 10). Team Gordon would race in 24 Busch Series races

featuring FOL as the team's primary sponsor. If Team Gordon failed to qualify for any [*6] one of the 24 races, Team Gordon was obligated to return $ 50,000 in sponsorship money to FOL for each race missed.

The Sponsorship Agreement provided that FOL would be sensitive to "any adverse publicity" caused by Team Gordon. (*Id.* at 8-9). It also outlined very specific and substantial obligations for Team Gordon to maintain a positive public image, to refrain from any conduct that would reflect unfavorably on FOL, and to allow FOL to terminate the sponsorship should Team Gordon's conduct fail to meet these standards.

**D. FOL Declined to Renew the Sponsorship for the Third Year**

| December 1, 2004 | $ 1,500,000 |
|---|---|
| March 1, 2005 | $ 750,000 |
| June 1, 2005 | $ 750,000 |
| September 1, 2005 | $ 750,000 |

(*Id.* at 11-12).

Team Gordon's performance in the Nextel Cup series was relatively poor. Team Gordon frequently suffered engine and mechanical problems that routinely kept the team from qualifying for races or contending in races for which the team qualified. The team failed to qualify for 7 of the 36 races that year, failed to finish 13 races, and finished 37th in the series' points standings. The team's average finishing position--in the 29 races it actually qualified for--was thirtieth.

When Team Gordon changed to the Nextel Cup series, the Sponsorship Agreement was not amended to reflect the change. Since Team Gordon was racing in fewer races, FOL wanted to increase the $ 50,000 refund for failing to qualify for a race that was applicable to the 24-race Busch Series arrangement to the standard refund amount of $ 150,000 for the Nextel Cup series. Team Gordon did not want to make the change and it took months of negotiating before Team Gordon finally paid FOL a refund of $ 150,000 for its failure to qualify for a Nextel Cup race in early 2005.

Toward the end of the 2004 season, Team Gordon decided to become a Nextel Cup Series team rather than a Busch Series team. It asked FOL if it would be willing to transform its 24-race Busch Series sponsorship into a sponsorship of Team Gordon for 10 of the 36 Nextel Cup Series races. A sponsorship in the Nextel Cup Series would allow Team Gordon to seek sponsorship from other companies and allow Team Gordon to field a team for a 36-race Nextel Cup season. FOL agreed, through Camp, to adjust the sponsorship accordingly. For the 2005 year of the Contract Period, the Sponsorship Fee was to be paid in accordance [*7] with the following schedule:

In July 2005, FOL [*8] declined to sponsor Team Gordon in 2006. On July 12, 2005, FOL executives Jim Corbett and Randy Koedyker traveled to Team Gordon's North Carolina offices to meet with Story to inform Team Gordon of its decision to decline sponsorship and to explain how the sponsorship had failed to meet FOL's expectations. The following day, FOL provided Team Gordon with a formal written notice of the decision. (Doc. No. 46-25). Team Gordon made no claim that FOL's decision violated the Sponsorship Agreement.

Team Gordon replaced FOL as a sponsor for the 2006 season. Menard's, a Midwestern department store chain that had sponsored Team Gordon for a handful of races in 2005, replaced FOL for the 2006 season. Menard's would pay Team Gordon $ 8.1 million for 18 races in 2006.

**E. FOL Defaulted on its Obligation to Make the September 1, 2005 Payment**

FOL made the sponsorship fee payments due under the Sponsorship Agreement through the June 1, 2005 payment. However, FOL did not make the September 1, 2005 payment. During the time the payment became due,

FOL was concerned that it would not be paid the $ 150,000 refund should Team Gordon fail to qualify in the remaining four FOL-sponsored races. FOL proposed a [*9] payment plan that would split up this final payment, reserving the payments of some amounts until at least some of the four races had been run.

These discussions were cordial. In a September 14, 2005 e-mail, Story explained that he was "supportive of the reasoning behind [FOL's] desire to break up the final payment, and underst[ood] that [FOL was] most likely trying to make sure that [FOL] would in fact get the rebate and/or refund should [Team Gordon] fail to qualify for an event . . . ." (Doc. No. 46-28 at 2). FOL and Team Gordon, however, never agreed to the schedule for the last payment, although FOL authorized the payment of $ 450,000 on September 16, 2005, and two more payments of $ 150,000 each on November 7 and 14, following the last two scheduled FOL races.

### F. FOL Terminated the 2005 Sponsorship Agreement

On September 19, 2005, Gordon wrecked with fellow driver Michael Waltrip during the Nextel Cup series race in Loudon, New Hampshire. Gordon's car hit the racetrack wall, and Gordon blamed Waltrip. After the wreck, Gordon got out of his car. While maintenance crews approached to haul his car to the race pits, Gordon waited on the apron of the track with his helmet off. As the [*10] race field passed by Gordon while driving under a caution flag--Gordon ran at Waltrip's car and threw his helmet at Waltrip's window.

Race officials escorted Gordon off the track to the track infield care center. After his examination for injury, Gordon left the care center and walked up to a television reporter for TNT (the network that carried the race on live television) for a post-accident interview. During the interview, Gordon called Waltrip "a piece of shit." (Doc. No. 46-3 at 44). NASCAR fined Team Gordon $ 35,000, docked Team Gordon 50 driver points, and placed Gordon on probation for the remainder of the season for his on-track conduct and statement during the post-race interview.

The next day, FOL gave written notice that it was terminating the sponsorship under section 12(b)(i) of the Sponsorship Agreement, ceasing further damage to FOL's brand by its association with Gordon. (Doc. No. 46-31). Pursuant to section 12(b)(i), the Sponsorship Agreement's so-called "morals clause," FOL had the right to terminate

the Sponsorship Agreement if Gordon:

> commits or has committed any act, or is charged with a felony, or has been or becomes involved in any situation or occurrence involving [*11] fraud, moral turpitude or otherwise reasonably tending to bring him into public disrepute, contempt, scandal or ridicule, or reasonably tending to shock, insult or offend any class or group of people, or reflecting unfavorably upon [FOL's] reputation or its products.

(Doc. No. 46-13 at 19). FOL claimed in the Termination Letter that by referring to fellow driver Michael Waltrip on live television as a "piece of shit" and by throwing his helmet at a competitor's car, "Robby has brought himself into public disrepute, contempt, scandal, and ridicule." (Doc. No. 46-31 at 2). FOL also cited in the Termination Letter other instances of Gordon's conduct that, in FOL's view, "cumulatively, tend to bring Robby Gordon into public disrepute." (*Id.*).

As of the date of the Termination Letter, Team Gordon was obligated to race in four more races with FOL as the sponsor. However, in the Termination Letter, FOL directed Team Gordon to immediately cease any use of the FOL logo and to remove any reference to FOL from the Team Gordon Website. Team Gordon complied with FOL's demand and did not display any FOL logos for the remainder of the 2005 NASCAR season or thereafter.

### G. Filing of the Complaint and [*12] Counterclaims

Team Gordon filed its complaint in state court in April 2006 which was then removed to this Court on May 3, 2006. (Doc. No. 4). The Complaint alleges that (1) FOL breached the contract when FOL decided not to renew the Sponsorship Agreement for the 2006 season (anticipatory breach); (2) FOL breached the contract by failing to pay the sponsorship fee in September 2005; and (3) FOL breached the contract by wrongfully terminating and bad faith. Team Gordon requests damages and a declaratory judgment.

FOL filed an amended answer and counterclaims on August 12, 2008. (Doc. No. 52). FOL alleged (1) Unfair and Deceptive Trade Practices; (2) Breach of Contract; (3) Declaratory Judgment; and (4) in the alternative,

unjust enrichment/money had and received.

## II. STANDARD

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The [*13] movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)). Once this initial burden is met, "the burden shifts to the nonmoving party to show that there are genuine issues of material fact." Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008). The party opposing a motion for summary judgment may not rest upon mere allegations or denials in his pleadings, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)); see Anderson, 477 U.S. at 252 (explaining that a "mere existence of a scintilla of evidence" is insufficient to overcome summary judgment). "[T]he non-moving party must present sufficient evidence such that 'reasonable jurors could find by a preponderance of the evidence' for the [*14] non-movant." Sylvia Dev. Corp. v. Calvert County, 48 F.3d 810, 818 (4th Cir. 1995) (quoting Anderson, 477 U.S. at 252). When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Matsushita, 475 U.S. at 587.

## III. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### A. Breach of Contract

In North Carolina, the elements of breach of contract are "(1) existence of a valid contract and (2) breach of the terms of that contract." Poor v. Hill, 138 N.C. App. 19, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000). A breach of contract is only actionable if a material breach occurs - one that "substantially defeat[s] the purpose of the agreement" or goes "to the very heart of the agreement," or can be "characterized as a substantial failure to perform." Fletcher v. Fletcher, 123 N.C. App. 744, 474 S.E.2d 802, 807-08 (N.C. Ct. App. 1996) (internal quotation marks omitted). Team Gordon asserts that FOL breached the terms of the Sponsorship Agreement when it failed to pay $ 750,000 which became due and owing on September 1, 2005.

FOL disputes that they breached the contract on September 1, 2005, because the parties were negotiating about the failure to qualify [*15] rebate. Negotiations continued until September 14, 2005, when John Story demanded the September 1 payment. Thus, FOL may be able to argue that if it was in breach of the contract, it breached on September 14, 2005, and under the contractual terms had 30 days to cure. FOL thereafter terminated the 2005 sponsorship on September 20, 2005, pursuant to section 12(b)(i) of the Sponsorship Agreement and thus was only technically in breach until Team Gordon's material breach on September 19, 2005. FOL asserts that it was justified in terminating the 2005 sponsorship under section 12(b)(i) following the Waltrip incident and that Team Gordon's material breach (the violation of the morals clause) discharged FOL's payment obligations.

"It is a material breach of contract to fail to pay any substantial amount of the consideration owing under the contract." Williston on Contracts § 63.16 (4th ed. 2008). The unambiguous contract provisions required FOL to pay Team Gordon $ 750,000 on September 1, 2005. FOL breached the 2005 Sponsorship Agreement when it refused to pay Team Gordon the September 1, 2005 payment. The Court finds that there is no genuine issue of material fact, and Team Gordon is entitled [*16] to summary judgment as to FOL's liability to Team Gordon for the September 1, 2005 payment.

### B. Damages Resulting from FOL's Breach of Contract for the September 1, 2005 Payment

Team Gordon asserts that it is entitled to $ 600,000 in damages for the 2005 season. [2] North Carolina courts hold that "[t]he measure of damages for a breach of

Page 5

contract is the amount which will compensate the injured party for his loss and which will put the plaintiff in as good a position as if the contract had been performed. To recover compensatory damages in a contract case, plaintiff must show that the damages claimed were the natural and probable result of the acts complained of, and must also show the amount of loss with reasonable certainty. Such damages may not be based on mere speculation or conjecture." *Ward v. Zabady*, 85 N.C. App. 130, 354 S.E.2d 369, 372 (N.C. Ct. App. 1987) (internal citations omitted). "It is an established principle that when there has been a breach of contract definite and entire, the injured party must do what fair and reasonable business prudence requires to save himself and reduce the damage, or the damage which arises from his own neglect will be considered too remote for recovery." *Tillinghast v. Cotton Mills*, 143 N.C. 268, 55 S.E. 621, 623 (N.C. 1906).

> 2 Team [*17] Gordon determined the $ 600,000 figure by trading one of the four races left in the season to Jim Beam, another sponsor, in lieu of the $ 150,000 failure to qualify rebate. Team Gordon, however, was unable to procure any paying, placement primary sponsors for the other races left in the season.

To recover, Team Gordon will have to show that it reasonably mitigated its damages for the 2005 season. FOL disputes that Team Gordon's efforts in mitigation were reasonable. The reasonableness of Team Gordon's mitigation efforts "depends on the circumstances of the particular case and is a jury question except in the clearest of cases." *Radford v. Norris*, 63 N.C. App. 501, 305 S.E.2d 64, 65 (N.C. Ct. App. 1983). Considering the evidence in the light most favorable to FOL, there is a genuine issue of material fact as to whether the mitigation of damages was reasonable, and Team Gordon is not entitled to summary judgment on its damages from the 2005 season.

## C. FOL's Breach of Contract and Unjust Enrichment Counterclaims

FOL alleges that at the time it terminated the 2005 sponsorship, FOL did not receive full value for its payments of $ 3,000,000 in sponsorship fees for 2005 because there were four remaining races [*18] when it terminated the 2005 sponsorship. Team Gordon asserts that FOL cannot prevail on its counterclaim because the plain language of the Sponsorship Agreement precludes

any recovery. FOL terminated the 2005 sponsorship pursuant to section 12(b)(i) of the Sponsorship Agreement which does not provide FOL the right to prorate the payments or the right to the refund it seeks.

To prevail on its claim, FOL would have to show that there was a valid contract and that there was a breach of the terms of that contract. *Poor, 530 S.E.2d at 843*. There is no dispute that the Sponsorship Agreement was a valid contract. FOL must prove that there was a breach of the terms of the Sponsorship Agreement when it did not receive full benefit of its sponsorship payments. FOL treated Gordon's conduct as grounds for termination pursuant to section 12(b)(i) of the Sponsorship Agreement. Other than that allegation, FOL has not identified any provision of the Sponsorship Agreement that Team Gordon has breached. *See Grasso v. Berg, 1997 U.S. App. LEXIS 11929, at *3 (4th Cir. 1997)* (unpublished) ("We also agree with the district court's finding that [plaintiff] submitted no evidence of breach of contract. In short, [*19] [plaintiff] identifies no provision in her lease agreement which has been breached."). Instead, FOL argues that it was damaged by the way the contract was constructed because all of the payments were front-loaded. As there is no genuine issue of material fact, Team Gordon is entitled to summary judgment on FOL's counterclaim for breach of contract.

FOL pleaded the unjust enrichment counterclaim in the event the court declared the Sponsorship Agreement null or void. As both parties have stipulated that the Sponsorship Agreement is a valid enforceable contract, this claim must fail. Team Gordon is entitled to summary judgment on FOL's unjust enrichment counterclaim.

## IV. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. Breach of Contract for 2006

Under section 3(b) of the Sponsorship Agreement, "[i]f in the sole reasonable judgment of [FOL] the program fails to substantially meet reasonable expectations, [FOL] shall have the option to terminate this Agreement. Written notice of such termination must be given to [Team Gordon] on or before August 1st of each respective year of the Contract Period and all subsequent rights and obligations shall be null and void." (Doc. No. 46-13 at 10). "Where a contract [*20] confers on one party a discretionary power affecting the rights of the other, this discretion must be exercised in a

reasonable manner based upon good faith and fair play." *Mezzanotte v. Freeland,* 20 N.C. App. 11, 200 S.E.2d 410, 414 (N.C. Ct. App. 1973).

FOL contends that it exercised the discretion given to it in the contract reasonably and in good faith when it gave notice that it would not be renewing the Sponsorship Agreement for 2006. FOL argues that the sponsorship with Team Gordon did not meet its expectations of potential t-shirt sales with SMI. FOL asserts that the Court could objectively measure its reasonable expectation under the contract because Larry Camp presented FOL with expectations of selling 4 million t-shirts to SMI. The actual sales during the first two years fell well below FOL's expectation.

Team Gordon responds that there are material facts of genuine dispute as to the reasonableness of FOL's actions. Team Gordon asserts that a jury could look at the facts and determine that the t-shirt side of the Sponsorship Agreement was not the cornerstone of the agreement. Team Gordon asserts that mere disappointment that the t-shirt sales did not amount to 4 million does not amount to [*21] a failure to meet reasonable expectations under the contract.

The Court concludes that there is a genuine issue of material fact as to whether the program failed to substantially meet reasonable expectations under the contract. Questions of reasonableness are best left to the jury and not subject to summary judgment. *See Radford,* 305 S.E.2d at 65 ("Since the test is one of reasonableness, and depends upon the circumstances of the particular case, it is a jury question except in the clearest of cases."). Thus, FOL is not entitled to summary judgment on its 2006 breach of contract claim.

## V. CROSS MOTIONS FOR SUMMARY JUDGMENT

### A. Unfair and Deceptive Trade Practices Act

Both Team Gordon and FOL move for summary judgment on FOL's counterclaim for unfair and deceptive trade practices under North Carolina General Statute § 75-1.1 ("UDTPA"). FOL alleges that Team Gordon violated the UDTPA when it paid commissions to Camp in violation of North Carolina General Statute § 14-353, which makes commercial bribery a crime. Team Gordon asserts that at the time Team Gordon and Camp entered into their agreement, Camp was not an agent authorized to procure services or labor for FOL and thus the statute does [*22] not apply.

In order to recover under the UDTPA, FOL must show the following:

> (1) that the defendant engaged in conduct that was in or affecting commerce, (2) that the conduct was unfair or had the capacity or tendency to deceive, and (3) that the plaintiff suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation. We have recognized that, under North Carolina law, the conduct sufficient to constitute an unfair or deceptive trade practice is a somewhat nebulous concept, and depends on the circumstances of the particular case. One thing is clear, however: Only practices that involve some type of egregious or aggravating circumstances are sufficient to violate the UDTPA. Generally, a trade practice will only be deemed unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

*ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co.,* 472 F.3d 99, 122-23 (4th Cir. 2006) (internal quotation marks and alternations omitted). In *Kewaunee Scientific Corp. v. Pegram,* 130 N.C. App. 576, 503 S.E.2d 417, 420 (N.C. App. 1998), the North Carolina Court of Appeals held that [*23] a violation of § 14-353 is an unfair and deceptive trade practice under § 75-1.1. Thus, FOL will have to show that Team Gordon's conduct of paying commissions to Camp constituted commercial bribery under § 14-353 and that Team Gordon's conduct constitutes an unfair and deceptive trade practice.

Section 14-353 states:

> [Part 1] Any person who gives, offers or promises to an agent, employee or servant any gift or gratuity whatever with intent to influence his action in relation to his principal's, employer's or master's business; [Part 2] any agent, employee or servant who requests or accepts a gift or

gratuity or a promise to make a gift or to do an act beneficial to himself, under an agreement or with an understanding that he shall act in any particular manner in relation to his principal's, employer's or master's business; [Part 3] any agent, employee or servant who, being authorized to procure materials, supplies or other articles either by purchase or contract for his principal, employer or master, or to employ service or labor for his principal, employer or master, receives, directly or indirectly, for himself or for another, a commission, discount or bonus from the person who makes [*24] such sale or contract, or furnishes such materials, supplies or other articles, or from a person who renders such service or labor; and [Part 4] any person who gives or offers such an agent, employee or servant such commission, discount or bonus, shall be guilty of a Class 2 misdemeanor.

N.C. Gen. Stat. § 14-353. In moving for summary judgment, FOL argues that Team Gordon's secret commissions to Camp while Camp was acting as an agent for FOL violated part four of the statute.

The commercial bribery statute is meant to prohibit "the general practice of bribery in commercial relationships [and] the influencing [of] agents, employees and servants." State v. Brewer, 258 N.C. 533, 129 S.E.2d 262, 272 (N.C. 1963). "The third and fourth parts of G.S. 14-353 refer to a commission, discount or bonus received by any agent, employee or servant under the circumstances therein specified, and to any person who gives or offers such an agent, employee, or servant such commission, discount or bonus." Id. at 277. Part three and four also require that the agent is authorized to procure materials, supplies, or other articles by purchase or contract or employ service or labor on behalf of the principal.

The North Carolina [*25] Court of Appeals described the type of relationship that might give rise to a commercial bribery claim in Kewaunee, 130 N.C. App. 576, 503 S.E.2d 417. The plaintiff Kewaunee employed defendant Pegram as its purchasing manager. The jury found that Pegram took payments from one of the other defendants to ensure that Pegram received contracts from Kewaunee and that Pegram refused to entertain quotes or bids from other potential suppliers. Id. at 420. Pegram, plaintiff's employee and purchasing manager, had the authority to procure goods for plaintiff. Additionally, Pegram's refusal to entertain quotes or bids from other potential suppliers gave the defendant an unfair advantage over all other suppliers.

In this case, Camp did not have the authority to enter into the Sponsorship Agreement on FOL's behalf and, thus, did not have the authority to procure goods or employ services for FOL. Camp's agreement with FOL stated that Camp could: (i) research and identify potential sponsorship opportunities; (ii) draft, present or evaluate sponsorship proposals and opportunities; (iii) make specific recommendations after consultation with FOL; (iv) evaluate and review sponsorship proposals and issues with FOL; (v) negotiate [*26] terms of sponsorship in consultation with FOL; (vi) draft sponsorship and related agreements and present them to FOL for preliminary approval; and (vii) present draft documents to third parties for negotiation and execution, and review any material issues with FOL. (Doc. No. 46-12). FOL retained all control over which team it sponsored and the details of that sponsorship. FOL did not give Camp any authority to bind FOL in a sponsorship agreement. Thus, Team Gordon did not violate part four of North Carolina General Statute § 14-353 by paying commission to Camp.

The record also makes clear that Team Gordon's relationship with Camp is not the type of relationship this statute intended to penalize. This statute prohibits a third party from secretly giving a bonus or commission to an employee or agent to betray his employer or principal in order to gain an unfair advantage over other competitors. At the time Camp and Team Gordon entered into the contract, Camp did not have a fiduciary relationship with FOL and thus could not have provided any unfair advantage or improper influence at that time. Camp's fiduciary relationship was in place, however, at the time Team Gordon paid his commission. [*27] But Camp did not give Team Gordon an unfair advantage over other teams he presented to FOL. In fact, Camp pushed two other teams over Team Gordon in his presentation to FOL. Unlike Pegram in Kewaunee, Camp did not give Team Gordon any unfair advantage over other potential teams.

Additionally, FOL was aware that Camp had potential conflicts with others in the industry. It was Camp's duty to disclose the conflict to FOL. His failure to disclose does not make Team Gordon's conduct of paying commissions illegal.

This Court finds that Team Gordon's relationship with Camp falls outside of the scope of the statute. Even taking the undisputed facts in the light most favorable to FOL, this Court concludes that Team Gordon's payment of commissions to Camp did not constitute commercial bribery. Because Team Gordon's payment of commissions to Camp did not constitute commercial bribery under § 14-353, FOL's UDTPA claim must fail. Team Gordon is thus entitled to summary judgment on FOL's counterclaim for unfair and deceptive trade practices under North Carolina General Statute § 75-1.1.

## VI. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. The Court **GRANTS** summary judgment to Team Gordon as to FOL's liability [*28] for the September 1, 2005 payment.

2. The Court **DENIES** summary judgment to Team Gordon on its damages claim for the 2005 season.

3. The Court **GRANTS** summary judgment to Team Gordon on FOL's 2005 breach of contract counterclaim and its unjust enrichment counterclaim.

4. The Court **DENIES** summary judgment on FOL's 2006 breach of contract counterclaim.

5. The Court **GRANTS** summary judgment to Team Gordon on FOL's counterclaim for unfair and deceptive trade practices act claim under North Carolina General Statute § 75-1.1.

**SO ORDERED.**

Signed: February 19, 2009

/s/ Robert J. Conrad, Jr.

Robert J. Conrad, Jr.

Chief United States District Judge