
Analysis
As of: Oct 09, 2012

# BOYKIN ANCHOR COMPANY, INC., Plaintiff, v. LARRY WONG and AT&T SERVICES, INC., Defendant.

## No. 5:10-CV-591-FL

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA, WESTERN DIVISION

### 2012 U.S. Dist. LEXIS 888

**January 4, 2012, Decided**
**January 4, 2012, Filed**

**SUBSEQUENT HISTORY:** Reconsideration denied by Boykin Anchor Co. v. Wong, 2012 U.S. Dist. LEXIS 37324 (E.D.N.C., Mar. 20, 2012)
Motion granted by Boykin Anchor Co. v. Wong, 2012 U.S. Dist. LEXIS 43813 (E.D.N.C., Mar. 29, 2012)

**PRIOR HISTORY:** Boykin Anchor Co. v. Wong, 2011 U.S. Dist. LEXIS 132799 (E.D.N.C., Nov. 17, 2011)

**CORE TERMS:** anchor, discovery, subpoena, telecommunications industry, seismic, intermediary, attorney's fees, undue burden, lost profits, citation omitted, competitor's, ceiling, discovery requests, telecommunication, burdensome, non-party, shipping, deceptive statements, marketplace, defamatory, reputation, domestic, floor, produce documents, trade practices, burden imposed, measure of damages, deceptive, relevance, producing

**COUNSEL:** [*1] For Boykin Anchor Company, Inc., Plaintiff: R. Daniel Boyce, LEAD ATTORNEY, Nexsen Pruet, PLLC, Raleigh, NC; Alex Ryan Williams, Raleigh, NC.

For Larry Wong, AT&T Services, Inc., Defendants: Hayden J. Silver, III, LEAD ATTORNEY, Raymond M. Bennett, Kilpatrick Townsend & Stockton LLP, Raleigh, NC.

For Hilti, Inc., Interested Party: Dennis C. Cameron, LEAD ATTORNEY, Bradley W. Welsh, Gable & Gotwals, Tulsa, OK; John L. Sarratt, LEAD ATTORNEY, Harris, Winfield, Sarratt & Hodges, LLP, Raleigh, NC.

**JUDGES:** Robert B. Jones, Jr., United States Magistrate Judge.

**OPINION BY:** Robert B. Jones, Jr.

**OPINION**

ORDER

This matter is before the court on Plaintiff's motion to compel to Hilti, Inc. ("Hilti"), a nonparty, to produce discovery. [DE-78]. Hilti has filed a response in opposition. [DE-82]. Both Plaintiff and Hilti seek attorney's fees in connection with the motion. A telephonic hearing on the motion was held 22 December 2011. Accordingly, the matter is ripe for adjudication.

**I. BACKGROUND**

This action was filed by Plaintiff Boykin Anchor Company, Inc. ("Plaintiff or "Boykin"), a North Carolina corporation, in state court on 19 November 2010 against Defendants Larry Wong and AT&T Services, Inc. (collectively "Defendants") and removed [*2] to this court on 29 December 2010. Following removal, Plaintiff filed an amended complaint, asserting additional causes of action against a number of new defendants. The court subsequently dismissed some of the parties and claims, leaving Defendant Larry Wong ("Wong") and Defendant AT&T Services, Inc. ("AT&T Services") as the remaining defendants and defamation and unfair or deceptive trade practices under the North Carolina Unfair or Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1, as the remaining claims. [DE-41].

Plaintiff manufactures seismic anchors for use in the telecommunications industry. Compl. ¶ 9. Plaintiff's anchors are referred to in the telecommunications industry as "Seisco anchors" or "Boykin/Seisco anchors." Compl. ¶¶ 8,11. Hilti also produces seismic anchors, referred to as HSL anchors. Aff. Martin Schofield ("Schofield Aff") ¶ 3 [DE-83]. Seismic anchors are used to secure digital switching cabinets to concrete floors. Compl. ¶ 9. According to Plaintiff, Hilti is Boykin's sole competitor for AT&T-related business. [1] *Id.* ¶ 21. In particular, Hilti's HSL-3 anchor is the only Hilti product in competition with the Boykin anchor. Pl.'s Mem. Supp. Mot. [*3] Order Compel Disc. ("Pl.'s Mem.") at 3 [DE-79]. The claims brought by Plaintiff stem from alleged false or deceptive statements by Wong, a former AT&T Services employee regarding Plaintiffs product, which have adversely impacted Plaintiff's business. Such statements include a 22 March 2010 email wherein Wong stated that "[AT&T Services'] should only be using Hilti anchors per most recent AT&T requirements." *Id.* ¶ 58.

> 1 Hilti disputes this assertion and contends that in addition to Boykin and Hilti, Simpson Strong-Tie Company, Inc. ("Simpson") and Powers Fasteners ("Powers") also supply anchors to the telecommunications industry. Hilti's Resp. Opp'n Pl.'s Mot. ("Hilti's Resp.") at 3 [DE-82].

According to Hilti, its HSL-3 anchor has been certified by the International Code Council's product evaluation service ("ICC-ES") as being in conformance with general construction code requirements. Schofield Aff. ¶¶ 4-5,7. As such, the HSL-3 anchor has a variety of applications and is used not only in the telecommunications industry, but also in the construction industry generally, which is its primary market. *Id.* ¶ 3. According to Hilti, Boykin's anchors are not certified for general construction [*4] applications by ICC-ES. *Id.* ¶ 7; Hilti's Resp. at 3 n.7. Thus, Hilti contends that the HSL-3 anchor has "little in common" with the Boykin anchor and "little about either anchor is fairly inferable from knowledge concerning the other." Hilti's Resp. at 3.

On 5 June 2011, Plaintiff served Hilti with a Subpoena to Produce Documents. [DE-79.1.]. Responses were served on Plaintiff on 1 July 2011, which included numerous general and specific objections. [DE-79.2]. Subsequently, on 13 July 2011, following a telephonic conference and two email exchanges, five of the fifteen requests for production of documents ("RPD") were addressed through Hilti's production of a sworn affidavit. Pl.'s Mem. at 2; Hilti's Resp. at 4. As to the remaining nine RPDs, Hilti informed Plaintiff that compliance therewith would involve individualized searches of numerous computers and paper files at an estimated cost to Plaintiff in excess of $20,000. Pl.'s Mem. at 1 -2; Hilti Resp. at 4-5. Following discovery between Plaintiff and Defendants, eight of the nine disputed discovery requests between Plaintiff and Hilti were resolved. Pl.'s Mem. at 3; Hilti Resp. at 3. On 15 September 2011, the court held a pre-motion [*5] telephonic discovery conference with the parties and Hilti, and held a hearing 22 December 2011 regarding the disputed discovery request. According to Plaintiff and Hilti, one of Plaintiff's discovery requests for the production of documents remains in dispute and is the subject of Plaintiff's motion.

## II. APPLICABLE LAW

Rule 45 of the Federal Rules of Civil Procedure governs subpoenas issued to third parties. *See* FED. R. CIV. P. 34(c)("As provided in Rule 45, a nonparty may be compelled to produce documents and tangible things or to permit an inspection."). In response to such a subpoena, a non-party may either file a motion to quash or modify the subpoena pursuant to Fed. R. Civ. P. 45(c)(3), move for a protective order pursuant to Fed. R. Civ. P. 26(c), or oppose a motion to compel production of the subpoenaed documents pursuant to Fed. R. Civ. P. 45(c)(2)(B). *Schaaf v. Smithkline Beecham Corp.*, 233 F.R.D. 451, 453 (E.D.N.C. 2005) (citation omitted).

Rule 45 adopts the standard codified in Rule 26, which allows for the discovery of "any nonprivileged matter that is relevant to any party's claim or defense"

when the discovery request "appears reasonably calculated to lead to the discovery [*6] of admissible evidence." FED. R. CIV. P. 26(b)(1). However, simply because "requested information is discoverable under Rule 26| ] does not mean that discovery must be had." *Nicholas v. Wyndham Int'l, Inc.*, 373 F.3d 537, 543 (4th Cir. 2004). Rule 26(b)(2) provides a district court may limit "the frequency or extent of use of the discovery methods otherwise permitted" under the Federal Rules of Civil Procedure if it concludes that "(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit." *Id.; see also McDougal-Wilson v. Goodyear Tire & Rubber Co.*, 232 F.R.D. 246, 249 (E.D.N.C. 2005) (noting "[d]iscovery is not limitless" and explaining "[t]he court has the discretion to protect a party from 'oppression' or 'undue burden or expense.'") (quoting Fed. R. Civ. P. 26(c)). When considering the propriety of enforcing a subpoena, a trial court should consider "the relevance of [*7] the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena." *Schaaf*, 233 F.R.D. at 453 (quoting *Heat & Control, Inc. v. Hester Indus.*, 785 F.2d 1017,1024 (Fed. Cir. 1986)); *accord Am. Elec. Power Co., Inc. v. United States*, 191 F.R.D. 132, 136 (S.D. Ohio 1999) (Whether a subpoena imposes an "undue burden" upon a witness is a case specific inquiry that turns on "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed.") (citations omitted)).

"In the context of evaluating subpoenas issued to third parties, a court 'will give extra consideration to the objections of a non-party, non-fact witness in weighing burdensomeness versus relevance.'" *Schaaf*, 233 F.R.D. at 453 (quoting *Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC*, 227 F.R.D. 421, 426 (M.D.N.C. 2005)); *see Am. Elec. Power Co.*, 191 F.R.D. at 136 ("Courts are required to balance the need for discovery against the burden imposed upon the person ordered to produce documents, and the status of a person as a non-party is [*8] a factor that weighs against disclosure.") (citations omitted). The party seeking to enforce a subpoena requesting documents from a non-party bears the burden of demonstrating that the documents sought are relevant. *Am. Elec. Power Co.*, 191 F.R.D. at 136 (citations omitted); *see* Fed. R. Civ. P. 45(c)(1) (stating "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction... on a party or attorney who fails to comply.")

Finally, the local rules of this district mandate that "[c]ounsel must [] certify that there has been a good faith effort to resolve discovery disputes prior to the filing of any discovery motions." Local Civil Rule 7.1 (c). Here, it is apparent both from the correspondence included with the motion as well as this court's participation with Plaintiff and Hilti in discovery conferences that they have attempted to resolve their discovery dispute prior to the filing of Plaintiffs motion to compel.

III. DISCUSSION

In RPD No. 13 to Hilti, Plaintiff seeks "any and all documents, contracts, [*9] inventory lists, compilations, charts or similar evidence that shows the amount of Hilti Anchors sold." [2] Following discussions with Hilti, Plaintiff narrowed the scope of RPD No. 13 to seeking two sets of data limited to the period of January 2006 to present: (1) "the total number of seismic anchors sold worldwide by Hilti" and (2) "the number of anchors sold ... to the six companies [identified as Nortel, Lucent Technologies, Alcatel Lucent, Emerson, Newton Instruments and Telect] that have had, or wanted to have, prior dealings with Boykin." Pl.'s Mem. at 7; *see also* Hilti Resp. at 5. In its memorandum, Plaintiff states it is willing to compromise as to the first data set by "accepting sales numbers for only the United States." Pl.'s Mem. at 8.

> 2   Plaintiff states the subpoena "narrowly defined 'Hilti Anchors' to only include the anchors from [the HSL-3/HSL Heavy Duty Expansion Anchor] . . . subset of Hilti products. Pl.'s Mem. at 3. However, the subpoena defines the scope as including "any seismic anchor manufactured by Hilti, Inc. (discontinued or active), including but not limited to the following anchors:" HSL-I, HSL-GR Heavy Duty Expansion Anchor, HSL-3 Heavy Duty Expansion Anchor, [*10] HSL-3-B Heavy Duty Expansion Anchor, HSL-3-G Heavy Duty Expansion Anchor, HSLG Anchor Kit and

any HSL Series anchors and any anchor kits that include HSL Series Anchors. [DE-79.1 ¶ M] (emphasis added).

Plaintiff contends the requested documents "are directly relevant to the damages associated with Boykin's claims; and therefore, are subject to discovery." Pl.'s Mot. ¶ 3. In particular, Plaintiff contends the "total number of seismic anchors sold by Hilti to the six companies" and "the total number of seismic anchors sold [throughout the United States] by Hilti" will provide a "floor" and "ceiling," respectively, for Boykin's damages. Pl.'s Mem. at 7-8.

A. Damages floor -- HSL anchor sales to the six companies

The six companies identified by Plaintiff apparently serve as intermediaries between anchor suppliers, such as Plaintiff and Hilti, and end-users, such as AT&T Services. In particular, according to Hilti, these "intermediaries" purchase products, including Boykin anchors and Hilti anchors, "for the construction of sites such as AT&T[] [Services'] footprints at cell phone towers." Hilti Resp. at 5. In explaining its request for the number of Hilti's HSL anchor sales to the six companies, [*11] Plaintiff provides the following rationale as explained by its damages expert:

> [T]hese numbers are necessary to provide a basis for a lost profits calculation. Boykin and Hilti are the only significant competitors in the domestic (United States) marketplace. Therefore, the damages expert has stated that it is a reasonable assumption that some or all of the subject anchor sales made to the six companies by Hilti might have been made by Boykin but for the Defendants' defamatory and deceptive statements. Accordingly, data is needed from Hilti about the amount of anchors sold to each of the six companies, so that alleged lost revenues, associated costs, and resulting lost profits might be computed. Lastly, the expert states that marketplace trends must be considered, and it is necessary to have the amount of anchors sold before, during and after the defamatory and deceptive statements to compare Boykin's market

share (relative to the six companies) with the only other anchor supplier (Hilti).

*Id.* at 7. Hilti has agreed to produce data reflective of HSL anchor sales to the six telecommunications intermediaries identified by Plaintiff upon receipt of the following information from Boykin: [*12] (1) account numbers from vendors whose sales Plaintiff allegedly lost or (2) an exact company name and address for each entity. Hilti explains this information is necessary because its

> computerized sales records may, for any given buyer, exist in the form of multiple accounts. A single buyer may have multiple accounts premised upon different shipping addresses, billing addresses or other information. Additionally, various customers may have similar names, which if used without precision will yield misleading and irrelevant search results.
>
> ...
> Without th[is] information, Hilti (1) can only guess about which accounts in its records are associated with the construction of sites relevant to AT&T, and (2) cannot gather data reflective of allegedly lost sales that would even come close to representing a damages "floor." The request, therefore, is not merely burdensome; it cannot be executed.

Hilti's Resp. at 5-6. Boykin, contending "it would be a waste of resources and an undue burden, if not impossible, for [it] to attempt to find" the requested information, contends Hilti's alleged barriers to Boykin's search request can be overcome if Hilti would

> produce sales information on their domestic [*13] sales of the seismic anchors listed in the subpoena ..., including information on sale time frame, customer, and quantity of anchors sold . . . [t]his would ensure that, regardless of exact entity name and address, [] all sales made to the six specific companies were obtained for use in computation of the damages.

Pl.'s Mem. at 8-9. However, this offered "compromise" or "solution" simply conflates the two data requests by Boykin into one single request - that is, a request for all

Page 4

domestic sales data on the Hilti HSL anchors. As discussed below, such a request is vastly overbroad as it would yield data irrelevant to Plaintiffs damages calculation and imposes an unduly burdensome and costly production obligation on Hilti.

In light of the above, the court finds nothing unreasonable about Hilti's response regarding the production of sales data between Hilti and the six intermediaries. Hilti has indicated its willingness to comply with this request subject to the provision of information by Plaintiff and has sufficiently explained how a search without said information will yield the discovery of both relevant and irrelevant information. *See* Schofield Aff. ¶ 9 (explaining how Hilti's computerized [*14] sales records are maintained and how the search request by Plaintiff would yield many irrelevant results). Moreover, Hilti has made a substantive showing on the issue of undue burden. *See Alberts v. Wheeling Jesuit Univ.*, No. 5:09-CV-l 09, 2010 U.S. Dist. LEXIS 42875, at *21, 2010 WL 1539852, at *8 (N.D. W. Va. Apr. 19, 2010) (explaining the party resisting discovery must show how requested discovery "was overly broad, burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden").

Boykin bears the burden of producing the identifiers requested by Hilti so that Hilti can properly respond to Boykin's request. Boykin presumably has access to its prior sales data to the six telecommunications intermediaries, including the various shipping addresses of these companies to which its anchor was supplied. Accordingly, Boykin, and not Hilti, should bear responsibility for collecting these addresses and supplying them to Hilti. Demanding that Hilti determine the applicable shipping addresses of these six companies to which Boykin's products were supplied is not practical and places Hilti in the position of either producing data which may not be responsive [*15] or constitutes an undue burden and expense. *See* Fed. R. Civ. P. 45(c)(1).

B. Damages ceiling -- HSL anchor sales throughout the United States

In justifying its request for these figures, Plaintiff explains:

> These numbers will be necessary because they, combined with Boykin's sales numbers, will provide the total market for these particular seismic anchors, a portion of which will be calculated as damages due to Boykin for damage to reputation within the seismic anchor industry. To determine this amount, the expert will need the total amount of anchors sold to determine the effect of the Defendants' defamatory and deceptive statements beyond the six companies. Without the data for the entire marketplace of anchors sold (Hilti anchors sold plus Boykin anchors sold), we cannot address the potential size of the market and the ultimate effect on prospective lost profits damage to reputation.

Pl.'s Mem. at 7-8 (emphasis added). Hilti contends Plaintiff's reliance on "total market" and "entire marketplace" data is misplaced as it first relies on the false premise that "Boykin and Hilti are the only significant competitors" suppling anchors to the telecommunications industry. Hilti's Resp. at 6-7 [*16] (quoting Pl.'s Mem. at 7). Rather, Hilti contends Boykin's competitors also include Simpson and Powers; thus, the "total market" must include telecom sales by these two companies. Hilti's Resp. at 4, 7. Hilti argues further that its anchor sales include sales to both the telecommunications industry as well as the general construction industry. Thus, any calculation for damages to Boykin's reputation utilizing Hilti's non-telecommunications sales [3] would "significantly overstate the damages 'ceiling' that Boykin seeks to define ...." Hilti's Resp. at 9.

> 3 Hilti argues also that its sales figures to "those in telecom who use Hilti's anchor in general construction because of its ICC-ES certification" are irrelevant and would distort the damages incurred by Boykin as a result of Defendants' actions. Hilti's Resp. at 8.

When determining the proper measure of damages, the court is mindful that the "measure of damages used should further the purpose of awarding damages, which is to restore the victim to his original condition, to give back to him that which was lost as far as it may be done by compensation in money." *Media Network, Inc. v. Long Haymes Carr, Inc.*, 197 N.C. App. 433, 448, 678 S.E.2d 671, 681 (2009) [*17] (citation omitted); *Roane-Barker v. Southeastern Hosp. Supply Corp.*, 99 N.C. App. 30, 40, 392 S.E.2d 663, 669 (1990) (a plaintiff is entitled to

recover those damages which are the natural and probable results of the tortfeasor's conduct). In a UDTPA case, the proper damages measure is "lost profits that were proximately caused by the tortfeasor as the measure of damages." *Media Network, Inc.*, 197 N.C. App. at 448, 678 S.E.2d at 681; *See* Alan D. Woodlief, Jr., North Carolina Law of Damages § 2:8 at 44 (5th ed. 2004) ("Lost profits constitute a proper element of damage where the loss is the direct and necessary result of the defendants' wrongful conduct and the profits can be shown with a reasonable degree of certainty. ")(collecting cases); *Roane-Barker*, 99 N.C. App. at 40, 392 S.E.2d at 670 (holding evidence of a competitor's sales in the same geographic area and to the same customers as plaintiff's sales was relevant and admissible to provide damages for lost profits for unfair and deceptive trade practice claim).

Here, Plaintiff seeks the recovery of its lost profits. Plaintiff has not alleged that its anchor was sold outside of the telecommunications industry and its allegations in [*18] its complaint focus solely on the telecommunications industry. *See e.g.*, Compl. ¶ 12 (stating its anchor sales "had earned a nationwide reputation of strength, stability and reliability in the telecommunications industry). As such, the profits allegedly lost include those associated with any Hilti anchor sales to intermediaries for telecommunication purposes only that Boykin could have made but for Wong's allegedly defamatory comments. Lost profits do not include sales of anchors by Hilti to any intermediary for use outside of the telecommunications industry or within that industry where ICC-ES certification was required.

Hilti has conceded that the "relevant 'ceiling' for damages is every sale [Boykin] could have made to telecom but for Defendants' alleged defamation . . . ." Hilti Resp. at 8 (emphasis in original). Hilti states that it has offered to produce the relevant domestic anchor sales data (that is, sales not requiring ICC-ES certification) to the telecommunication industries but review of Hilti's response brief indicates it has only agreed as to the six companies with whom Boykin had prior dealings. Arguments presented by Boykin and Hilti suggest the telecommunications industry [*19] includes companies beyond those six companies that have been identified. However, neither Boykin nor Hilti has disclosed the names of these additional companies nor have they discussed the burden imposed in seeking relevant anchor sales data from these intermediaries. As Boykin has never had prior dealings with these unidentified companies, it is unable to provide shipping addresses. While the parties agree, and the court finds, that discovery of anchor sales to these additional telecommunications companies is relevant to calculating a damages ceiling according to Plaintiff's case theory, the burden and expense in obtaining this information should be considered. As such, to the extent Plaintiff seeks this additional information, the parties should explore ways in which to identify and obtain this particular data, remaining mindful of any burden or expense in producing the data.

C. Attorneys Fees

Both Plaintiff and Hilti seek attorney's fees in connection with Plaintiffs Motion. *See* Pl.'s Mot. ¶ 4; Hilti's Resp. at 82. The imposition of attorney's fees is "part of a court's necessary role in supervising discovery." *Kidd v. Greyhound Lines, Inc.*, No. 3:04CV277, 2004 U.S. Dist. LEXIS 30625, at *14, 2004 WL 3756420, at *4 (E.D. Va. Sept. 23, 2004). [*20] Indeed, Rule 37 provides that where a motion to compel is denied, the court "must... require the movant, the attorney filing the motion, or both to pay the party | ] who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees" unless the motion "was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(B). Considering the basis for Plaintiff's motion and the modified nature of the court's order, an award of attorney's fees is not appropriate at this time. Accordingly, the requests for attorney's fees by both Plaintiff and Hilti are DENIED.

**IV. CONCLUSION**

For the reasons set forth above, Plaintiffs Motion for an Order Compelling Hilti, Inc. to Produce Discovery [DE-78] is DENIED.

So ordered, this the 4th day of January, 2012.

/s/ Robert B. Jones, Jr.

Robert B. Jones, Jr.

United States Magistrate Judge